Patrick O. OJO, on Behalf of Himself
and All Others Similarly
Situated, Appellant,

v.

FARMERS GROUP, INC., Fire Under-
writers Association, Fire Insurance
Exchange, Farmers Underwriters As-
sociation, and Farmers Insurance Ex-
change, Appellees.

No. 10–0245.

Supreme Court of Texas.

Argued Oct. 14, 2010.

Decided May 27, 2011.

James A. Francis, Philadelphia, PA, Andrew S. Friedman, Phoenix, AZ, Barrett Stephan Litt, Los Angeles, CA, John J. Stoia Jr., Sanford Svetcov, San Francisco, CA, John A. Yanchunis, Tampa, FL, and Jane M.N. Webre, Austin, for Appellant.

Harriet S. Posner, Los Angeles, CA, Charles W. Schwartz, Houston, Allison B. Holcombe and Carl Alan Roth, Los Angeles, CA, for Appellees.

Justice GREEN delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice WAINWRIGHT, Justice MEDINA, Justice JOHNSON, Justice GUZMAN, and Justice LEHRMANN joined, and in which Justice WILLETT joined as to Parts I, II, III.A–B, IV, and V.

The United States Court of Appeals for the Ninth Circuit certified to this Court the following question:

> Does Texas law permit an insurance company to price insurance by using a credit-score factor that has a racially disparate impact that, were it not for the [McCarran–Ferguson Act],[1] would violate the federal Fair Housing Act, 42 U.S.C. §§ 3601–19, absent a legally sufficient nondiscriminatory reason, or would using such a credit-score factor violate Texas Insurance Code sections

544.002(a), 559.051, 559.052, or some other provision of Texas law?

*Ojo v. Farmers Group, Inc.*, 600 F.3d 1201, 1204–05 (9th Cir.2010) (en banc) (per curiam). Pursuant to Article 5, section 3–c of the Texas Constitution and Texas Rule of Appellate Procedure 58.1, we answer that Texas law prohibits the use of race-based credit scoring, but permits race-neutral credit scoring even if it has a racially disparate impact.

## I. Introduction

Patrick Ojo, an African–American resident of Texas, carries a homeowner's property-and-casualty insurance policy issued by Farmers Group, Inc. *Id.* at 1202. Although Ojo has never made a claim on his homeowner's policy, Farmers raised Ojo's insurance premium by nine percent. *Id.* Ojo alleges that Farmers increased the premium as a result of unfavorable credit information acquired though its automated credit-scoring system. *Id.*

On behalf of himself and other racial minorities whose premiums increased as a result of Farmers' use of a credit-scoring system, Ojo sued Farmers and its affiliates, subsidiaries, and reinsurers in federal court. *Id.* Ojo alleges that the defendants' credit-scoring systems employ several "undisclosed factors" which result in disparate impacts for minorities and violate the federal Fair Housing Act (FHA), 42 U.S.C. §§ 3601–3619. *Ojo*, 600 F.3d at 1202. Ojo does not assert that he or any other member of the putative plaintiff class has suffered intentional discrimination at the hands of the defendants. *Id.*

Citing Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), the defendants moved to dismiss all of Ojo's claims. *Id.*

---

**1.** The McCarran–Ferguson Act (MFA) allows state insurance law to "reverse-preempt" federal law that does not directly relate to insurance. *See* 15 U.S.C. § 1012(b); *Ojo v. Farmers Group, Inc.*, 600 F.3d 1201, 1203 (9th Cir.2010) (en banc) (per curiam).

Applying the McCarran–Ferguson Act's (MFA) reverse-preemption standard, 15 U.S.C. § 1012(b), the district court concluded that the Texas Insurance Code preempted Ojo's FHA claims. *Id.* at 1203. Accordingly, the district court declined to answer whether Ojo's disparate-impact discrimination claim sufficiently complied with Federal Rule of Civil Procedure 12(b)(6). *Id.* at 1202. On appeal to the United States Court of Appeals for the Ninth Circuit, a divided three-judge panel held that Texas law did not reverse-preempt Ojo's FHA claim, initially reversing the district court. *Ojo v. Farmers Group, Inc.*, 565 F.3d 1175, 1178 (9th Cir. 2009). Subsequently, the Ninth Circuit ordered the case reheard en banc. *Ojo v. Farmers Group, Inc.*, 586 F.3d 1108, 1108 (9th Cir.2009). The Ninth Circuit's rehearing en banc resulted in the certified question now before us. *See Ojo*, 600 F.3d at 1204–05.

## II. Background

Ojo sued in federal court based on the FHA, under which it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race." 42 U.S.C. § 3604(b). Federal courts of appeals have interpreted this FHA provision to prohibit not just intentional acts of discrimination, but also race-neutral actions that have discriminatory effects on racial minorities (disparate-impact discrimination).[2] Several courts of appeals have also held that the FHA applies in the underwriting of homeowner's property insurance, given the FHA's prohibition of discrimination "in the provision of services ... in connection" with the "sale or rental of a dwelling." 42 U.S.C. § 3604(b); *see, e.g., Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1360 (6th Cir.1995); *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 301 (7th Cir.1992). Ojo's cause of action asserts this type of disparate impact liability in Farmers' pricing of homeowner's insurance based on credit scoring.

■ Ojo's disparate impact claim, however, may be "reverse-preempted" by Texas law under the MFA, which provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, ... unless such Act specifically re-

---

**2.** *See Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1293–94 (7th Cir.1977) (recognizing that a village's refusal to rezone plaintiffs' property to accommodate federally financed low-cost housing had the potential to effect a strong discriminatory impact capable of violating the federal FHA); *United States v. City of Black Jack*, 508 F.2d 1179, 1184 (8th Cir.1974) ("Title VIII [the FHA] is designed to prohibit all forms of discrimination, sophisticated as well as simple-minded." (internal quotation marks omitted)); *cf. Pfaff v. U.S. Dep't of Hous. and Urban Dev.*, 88 F.3d 739, 747–50 (9th Cir. 1996) (holding that the Department of Housing and Urban Development (HUD) failed to establish a prima facie case against a private landlord that a facially neutral, numerical occupancy restriction illegally discriminated against families with children, and admonishing HUD for alleging such restrictions were discriminatory); *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555–56 (5th Cir.1996) (holding that a jury verdict awarding damages for disparate impact discrimination under the federal FHA was not supported by sufficient evidence when the plaintiff identified only a bank's rejection of his loan application, rather than a specific bank policy or practice, as having adverse, discriminatory effects on minorities). *But see Town of Huntington v. Huntington Branch, NAACP*, 488 U.S. 15, 16, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (per curiam) (refusing to address whether a town's refusal to rezone violated the federal FHA and provided a cause of action based on disparate impact).

lates to the business of insurance." 15 U.S.C. § 1012(b). Under the MFA, state law reverse-preempts a federal statute if: "(1) the federal law does not specifically relate to insurance; (2) the state law is enacted for the purpose of regulating insurance; and (3) the application of federal law to the case might invalidate, impair, or supersede the state law." *Ojo*, 600 F.3d at 1208–09 (citing *Humana Inc. v. Forsyth*, 525 U.S. 299, 307, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999)). The Ninth Circuit, hearing this case en banc, held that "it is undisputed that the FHA does not specifically relate to insurance," thus satisfying the first prong of MFA reverse-preemption.[3] *Id.* at 1203. It is also undisputed that "the relevant provisions of Texas law … are enacted for the purpose of insurance regulation," thus satisfying the second prong. *Id.* The certified question before us specifically deals with the third prong, and asks whether allowing Ojo's claim under the FHA might invalidate, impair, or supersede Texas law. *See id.* at 1204–05. In light of the fact that Texas only prohibits the use of credit score factors or rates *based on* race, or rates that differ *because of* race, we answer that application of the FHA to permit a cause of action for disparate impact resulting from the use of credit scoring in the field of insurance certainly might invalidate, impair, or supersede Texas law.

**III. The Texas Insurance Code Does Not Provide for a Cause of Action Based on a Racially Disparate Impact**

■ The Texas Insurance Code expressly prohibits "unfair discrimination"

and specifically states that "[a] person may not … charge an individual a rate that is different from the rate charged to other individuals for the same coverage because of the individual's race, color, religion, or national origin." TEX. INS.CODE § 544.002(a)(1). An exception to this provision provides that "[a] person does not violate Section 544.002 if the refusal, limitation, or charge is required or authorized by law or a regulatory mandate." *Id.* § 544.003(c). Farmers points out that § 559.051 authorizes the use of race-neutral credit score factors, and that this authorization is the exception to § 544.002, which is recognized in § 544.003. Section 559.051 permits an insurer to "use credit scoring, except for factors that constitute unfair discrimination, to develop rates, rating classifications, or underwriting criteria." *Id.* § 559.051; *see also id.* § 559.052(a)(1) ("An insurer may not use a credit score that is computed using factors that constitute unfair discrimination. …"). The factors that "constitute unfair discrimination" are not defined in the Texas Insurance Code. However, the Code does define an "unfairly discriminatory" rate as one that "is *based wholly or partly on the race*, creed, color, ethnicity, or national origin of the policyholder or an insured." *Id.* § 560.002(c)(3)(C) (emphasis added).

Under Texas Insurance Code § 559.201, the use of credit score factors defined by § 559.052(a)(1) that constitute "unfair discrimination" is deemed an "unfair practice in violation of Chapter 541." *Id.* § 559.201 (making violations of Chapter 559 an unfair practice under Chapter 541). Unfair

---

**3.** We note the conundrum this creates: without reverse-preemption of the federal FHA by Texas law, Ojo would have a disparate impact cause of action for *insurance* pricing under the federal FHA, and yet, reverse-preemption is only at issue if the federal FHA does not "specifically relate[ ] to the business of insur-

ance." 15 U.S.C. § 1012(b). However, this is not an issue the certified question requires us to resolve. We instead focus our attention on whether Texas law provides for a disparate impact cause of action for insurance pricing based on credit scoring.

practices under Chapter 541 are subject to private civil suits, including class actions. *Id.* §§ 541.151 (Private Action for Damages Authorized), 541.251(a) (Class Action Authorized); *see Farmers Group, Inc. v. Lubin,* 222 S.W.3d 417, 421–22 (Tex.2007).

No Texas courts have interpreted whether these Insurance Code provisions prohibit only intentional discrimination or also discrimination based on disparate impact. We derive from these provisions that insurance rates may not be "based wholly or partly on" race, and that an individual may not be charged a rate that is "different from the rate charged to other individuals for the same coverage *because of* the individual's race." TEX. INS. CODE §§ 544.002(a)(1) (emphasis added), 560.002(c)(3)(C). Additionally, while credit scoring is authorized, it may not be based on "factors that constitute unfair discrimination." *Id.* §§ 559.051, 559.052(a)(1). We can only assume that a credit score *factor* constitutes unfair discrimination if it is "based wholly or partly on" race, or if it is used to arrive at an insurance rate that is "different from the rate charged to other individuals for the same coverage *because of* the individual's race." *See id.* §§ 544.002(a)(1), 560.002(c)(3)(C). Ojo alleges these provisions not only prohibit intentional discrimination—the use of race-based classifications to price insurance differently—but also prohibit disparate impact discrimination—the use of race-neutral pricing schemes that effectuate disparate results (in this case, racial minorities alleging they have suffered higher premium rates as a direct consequence of race-neutral credit scoring). However, nothing in the Insurance Code prohibits the use of race-neutral credit scoring. In fact, the Code requires that the factors used in credit scoring to price insurance be race-neutral, or not *based on* race. *See id.* §§ 544.002(a)(1), 560.002(c)(3)(C). The nature of Ojo's dis-

parate impact claim presupposes that these factors are race neutral, which is exactly what the Code requires. Nevertheless, to support his argument that the "based on" and "because of" race language in the Texas Insurance Code implies the availability of a cause of action for disparate impact discrimination, Ojo draws our attention to the same language used in the FHA, an act which has been interpreted to provide for disparate impact protection. *See* 42 U.S.C. § 3604; *see, e.g., City of Black Jack,* 508 F.2d at 1184. Ojo also relies on the United States Supreme Court's interpretation of Title VII of the Civil Rights Act as providing for a disparate impact cause of action, an act that also prohibits discrimination "because of" race. *See* 42 U.S.C. § 2000e–2; *Smith v. City of Jackson,* 544 U.S. 228, 240, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005); *Griggs v. Duke Power Co.,* 401 U.S. 424, 436, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). However, given the numerous other considerations, addressed below, that have led federal courts to broadly interpret the FHA and Title VII, we find this argument unavailing. We are also guided by the fact that the use of the "because of" race and "based on" race language in Texas case law and the Texas Labor Code has been more in association with intentional discrimination claims than claims for disparate impacts. We first address the use of this language within Texas statutes and case law.

**A. The Language of the Insurance Code Is Inconsistent with a Disparate Impact Theory of Liability**

The Texas Insurance Code prohibits "unfairly discriminatory" insurance rates as those that charge differently "because of" or "based wholly or partly on" race. *See* TEX. INS.CODE §§ 544.002(a)(1), 560.002(c)(3). Texas courts considering

this language in the employment context have used the "because of" and "based ... on" race language in the disparate treatment context, but not in the area of disparate impacts. In *University of Texas v. Poindexter,* 306 S.W.3d 798 (Tex.App.-Austin 2009, no pet.), the court of appeals held that "[d]isparate-treatment discrimination addresses employment actions that treat an employee worse than others *based on* the employee's race, color, religion, sex, or national origin. In such disparate-treatment cases, proof and finding of discriminatory motive is required." *Id.* at 804 n. 1 (emphasis added); *accord Massarsky v. Gen. Motors Corp.,* 706 F.2d 111, 117 (3d Cir.1983) (noting that a plaintiff could establish intentional discrimination when his "employer applied an expressly *race-based* or *sex-based* standard in its treatment of the plaintiff" (emphasis added)). In *Wal–Mart Stores, Inc. v. Davis,* 979 S.W.2d 30 (Tex.App.-Austin 1998, pet. denied), the court of appeals described disparate impact claims as those that "involve facially neutral practices ... that operate to exclude a disproportionate percentage of persons in a protected group and cannot be justified by business necessity.... Disparate treatment [exists where] the defendant ... treats some people less favorably than others *because of* their race, color, religion, sex, or national origin." *Id.* at 44 (emphasis added). The United States Supreme Court has similarly distinguished between disparate treatment discrimination and disparate impact discrimination, noting that the former is discrimination against others "because of their race," while the latter encompasses "practices that are facially neutral ... but that in fact fall more harshly on one group than another." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *see also Smith,* 544 U.S. at 239, 125 S.Ct. 1536 (plurality opinion).

Significantly, the phrase "because of race" is also used in the Texas Labor Code, which makes an employer liable for taking action adverse to an employee "because of race." *See* TEX. LAB.CODE § 21.051. Under the Labor Code, a plaintiff must show causation by demonstrating that race was a motivating factor in the employer's decision, the standard for proving intentional discrimination, or disparate treatment. *See id.* § 21.125(a) ("Except as otherwise provided by this chapter, an unlawful employment practice is established when the complainant demonstrates that race ... was a motivating factor for an employment practice, even if other factors also motivated the practice ...."); *cf. Quantum Chem. Corp. v. Toennies,* 47 S.W.3d 473, 480 (Tex.2001) (holding that in a claim for age discrimination, an employee must show that age was a motivating factor in the employer's decision to terminate the employee); *Herbert v. City of Forest Hill,* 189 S.W.3d 369, 375 (Tex. App.-Fort Worth 2006, no pet.) (holding that to prove causation in a race discrimination case, a plaintiff "must establish that race was a motivating factor for [the] employment practice" (internal quotation marks omitted)). In addition, the Texas Legislature expressly provided for disparate impact protection in Texas Labor Code § 21.122(a)(1),[4] where it defined the burden of proof for disparate impact cases in the employment context:

---

4. The Texas Government Code also prohibits fire departments from administering tests that disparately impact "any group defined by race." TEX. GOV'T CODE § 419.103. These tests must also comply with Chapter 21 of the Labor Code, which occurs when "the disparate impact on a group is the result of a bona fide occupational qualification." *Id.* § 419.103(b).

An unlawful employment practice based on disparate impact is established under this chapter only if a complainant demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race ... and the respondent fails to demonstrate that the challenged practice is job-related for the position in question and consistent with business necessity. . . .

*Id.* No such section appears in the Texas Insurance Code. The Texas Legislature, well aware of how to create a cause of action for disparate impact discrimination, chose not to do so in the field of insurance, specifically with regards to the use of credit scoring.[5] Because the Legislature chose not to include a section expressly providing for or defining a disparate impact claim in the Texas Insurance Code, but did do so in the Texas Labor Code, we conclude that the Legislature did not intend to provide for disparate impact liability for the use of credit scoring in pricing insurance.

**B. The Use of "Because of" Race in the Federal FHA and Title VII Did Not Alone Prompt Federal Courts to Hold That These Acts Create Causes of Action Based on Racially Disparate Impacts**

■ Ojo relies on federal case law interpreting the FHA and Title VII to provide for disparate impact protection, arguing that the Texas Insurance Code should also be interpreted to provide for disparate impact protection because it uses the same "because of race" language as those federal acts. *See* 42 U.S.C. § 2000e–2 (prohibiting discrimination by employers of individuals "because of such individual's race"); 42 U.S.C. § 3604(b) (prohibiting discrimination in the provision of services in connection with housing "because of race"); TEX. INS.CODE § 544.002(a) (defining unfair discrimination as providing insurance coverage differently "because of the individual's ... race"). Although Ojo has pointed us to a wealth of federal authority holding that the FHA and Title VII provide for disparate impact protection, the reasons supporting those holdings extend far beyond the use of the phrase "because of race." *See, e.g., Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights,* 558 F.2d 1283, 1289 (7th Cir.1977) (focusing on the policy goals of the FHA in deciding on a broad interpretation of its provisions); *see also* Peter E. Mahoney, *The End(s) of Disparate Impact: Doctrinal Reconstruction, Fair Housing and Lending Law, and the Antidiscrimination Principle,* 47 EMORY L.J. 409, 425 (1998) (describing the origins of the disparate impact standard under the FHA as partially "borrowed" from the case law on Title VII, and also noting the standard's diverse and inconsistent application by federal courts). In determining whether a statute provides for disparate impact protection, federal and state courts have looked first to the language of the statute to assess whether "the thrust of the Act [is] to the consequences of ... practices, not simply the

---

5. *See Harris County Hosp. Dist. v. Tomball Reg'l Hosp.,* 283 S.W.3d 838, 847 (Tex.2009) ("The judiciary's task is not to refine legislative choices. . . . The judiciary's task is to interpret legislation as it is written."); *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540 (Tex.1981) ("It is a rule of statutory construction that every word of a statute must be presumed to have been used for a purpose ... [and] we believe every word excluded from a statute must also be presumed to have been excluded for a purpose."); *cf. Tex. Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 854 (Tex.2002) (similarly holding that in the realm of statutory waiver of sovereign immunity, it is the Texas Legislature's task to "weigh the conflicting public policies" in enacting statutes providing for such waiver).

motivation." *Griggs*, 401 U.S. at 432, 91 S.Ct. 849; *see also Tex. Parks & Wildlife Dep't v. Dearing*, 240 S.W.3d 330, 352 (Tex.App.-Austin 2007, pet. denied). The United States Court of Appeals for the Seventh Circuit actually regarded the phrase "because of race" as a potential obstacle to disparate impact protection before considering the policy goals behind the FHA:

> The major obstacle to concluding that action taken without discriminatory intent can violate section 3604(a) is the phrase "because of race" contained in the statutory provision. The narrow view of the phrase is that a party cannot commit an act "because of race" unless he intends to discriminate between races.... The broad view is that a party commits an act "because of race" whenever the natural and foreseeable consequence of that act is to discriminate between races, regardless of his intent.

*Vill. of Arlington Heights*, 558 F.2d at 1288; *accord Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 146 (3d Cir.1977) ("[W]e note that the 'because of race' language might seem to suggest that a plaintiff must show some measure of discriminatory intent."). The Seventh Circuit declined to take a narrow view of the "because of race" language because of the congressional mandate within the FHA "to provide, within constitutional limitations, for fair housing throughout the United States." *Vill. of Arlington Heights*, 558 F.2d at 1289 (quoting 42 U.S.C. § 3601). The Seventh Circuit also relied on previous interpretations of the FHA, and its goal to "promote 'open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat.'" *Id.* (quoting *Otero v. N.Y. City Hous. Auth.*, 484 F.2d 1122, 1134 (2d Cir. 1973)). Other federal circuit courts applying disparate impact protections under the FHA have also relied upon this congressional mandate.[6] Numerous courts have also noted that the need for disparate impact protection under the FHA arose from the lack of disparate impact liability under the Fourteenth Amendment after the United States Supreme Court's decision in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and the difficulty of proving intentional discrimination.[7]

**6.** *See, e.g., Rizzo*, 564 F.2d at 147 (noting that "[a]lthough the legislative history of Title VIII [the FHA] is somewhat sketchy, the stated congressional purpose demands a generous construction of Title VIII"); *City of Black Jack*, 508 F.2d at 1184 (recognizing that the FHA was "passed pursuant to the congressional power under the Thirteenth Amendment to eliminate the badges and incidents of slavery," and noting that the United States Supreme Court has treated the entire Civil Rights Act of 1866, another act passed under the power of the Thirteenth Amendment, broadly (citing *Jones v. Mayer Co.*, 392 U.S. 409, 442–43, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) ("[W]hen racial discrimination herds men into ghettos and makes their ability to buy property turn on the color of their skin, then it too is a relic of slavery."))).

**7.** *See, e.g., Rizzo*, 564 F.2d at 146 ("Given the increased burden of proof which *Washington v. Davis* and *Arlington Heights* now place upon equal protection claimants, we suspect that Title VIII will undoubtedly appear as a more attractive route to nondiscriminatory housing, as litigants become increasingly aware that Title VIII rights may be enforced even without direct evidence of discriminatory intent."); *Vill. of Arlington Heights*, 558 F.2d at 1290 ("[A] requirement that the plaintiff prove discriminatory intent ... is often a burden that is impossible to satisfy."); *City of Black Jack*, 508 F.2d at 1185 ("Effect, and not motivation, is the touchstone, in part because clever men may easily conceal their motivations ...."); *see also* Peter E. Mahoney, *The End(s) of Disparate Impact: Doctrinal Reconstruction, Fair Housing and Lending Law, and the Antidiscrimination Principle*, 47 EMORY L.J.

In determining whether discriminatory impact liability exists within the FHA, Title VII, and the Age Discrimination in Employment Act (ADEA), state and federal courts have also focused on the breadth and reach of prohibitory language, and have refused to find disparate impact liability when a statute focuses only on the nature of an action, and not on its effects. *See, e.g., Monson v. Rochester Athletic Club,* 759 N.W.2d 60, 67 (Minn.Ct.App. 2009) (holding that there was no disparate impact liability where "the [state law] does not include such effects-based language"); *see also Smith,* 544 U.S. at 235–36, 125 S.Ct. 1536 (holding that the ADEA provides for disparate impact liability because it not only prohibits employers' actions that "limit, segregate, or classify" persons, but rather, also prohibits actions that "deprive any individual of employment opportunities or *otherwise adversely affect* his status as an employee" (citing 29 U.S.C. § 623(a))); *Dearing,* 240 S.W.3d at 339 (quoting *Smith,* 544 U.S. at 235, 125 S.Ct. 1536). Both Title VII and the ADEA have been interpreted by the United States Supreme Court to provide for disparate impact liability because they go so far as to prohibit practices that "tend to deprive employees of opportunities." *See Smith,* 544 U.S. at 235–36, 125 S.Ct. 1536 (ADEA); *Griggs,* 401 U.S. at 430–32, 91 S.Ct. 849 (Title VII); *see also Huntington,* 488 U.S. at 18, 109 S.Ct. 276 (declining to determine whether the FHA provides for disparate impact protection, stating: "Since appellants conceded the applicability of the disparate-impact test for evaluating the zoning ordinance under Title VIII, we do not reach the question whether that test is the appropriate one.").

Sections 544.002(a) and 560.002(c)(3) of the Texas Insurance Code do not include the type of broad prohibitory language that gives rise to disparate impact claims. Rather, both sections focus exclusively on the manner in which insureds are classified; that is, they prohibit classifications *because of* or *based on* race. Neither statute broadens its application so as to prohibit practices that may "otherwise adversely affect" or "tend to deprive" an insured of an opportunity, or any other similarly expansive language, as was the case in the federal acts at issue in *Griggs* and *Smith. See Smith,* 544 U.S. at 235–36, 125 S.Ct. 1536 (ADEA); *Griggs,* 401 U.S. at 430–32, 91 S.Ct. 849 (Title VII). Rather, the Texas Insurance Code authorizes actions that classify individuals based on credit score in order to affect insurance pricing, as long as such classifications are not based on race or because of race. *See* Tex. Ins.Code §§ 544.002(a), 559.051, 560.002(c)(3). As long as insurers use race-neutral factors in credit scoring to set insurance rates, they do not run afoul of the Texas Insurance Code in the way an employer would run afoul of Title VII for using race-neutral testing that adversely affects employees of a certain race. *See Griggs,* 401 U.S. at 430, 91 S.Ct. 849 ("Under [Title VII], practices, procedures or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices."). Because the Texas Insurance Code expressly authorizes credit scoring, it cannot be subject to the same breadth of interpretation applied to Title VII or the FHA simply because it uses the phrases "because of" or "based . . . on" race. Ojo's argument that federal interpretations of

409, 425–26 (1998) (noting that many federal courts in the years after enactment of the FHA "aggressively expand[ed] the scope and application of equal protection analysis to a host of local governmental activities" because of the "difficulty of proving an overt intent to discriminate," which led to a similar expansion of the protection afforded by the FHA).

these acts should control our interpretation of the Texas Insurance Code is unavailing in light of the additional considerations, other than some similar language, present in the federal case law.

## C. The Legislative History of the Insurance Code Is Inconsistent with a Disparate Impact Theory of Liability

In addition to the express language of the statute, courts have looked to a statute's legislative history when determining whether the statute gives rise to a disparate impact theory of liability. *See, e.g., Smith,* 544 U.S. at 238, 125 S.Ct. 1536 ("[W]e think the history of the enactment of the ADEA ... supports the ... consensus concerning disparate-impact liability."); *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 389, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (examining the legislative history of 42 U.S.C. § 1981 and holding the statute did not give rise to a disparate impact claim); *Griggs,* 401 U.S. at 436, 91 S.Ct. 849 ("From the sum of the legislative history relevant in this case, the conclusion is inescapable that the [agency's] construction ... comports with congressional intent."); *Dearing,* 240 S.W.3d at 351 ("When ascertaining legislative intent, we may also consider ... the law['s] ... history ...."); *see also* TEX. GOV'T CODE § 311.023(3) (allowing courts to consider legislative history when construing statutes). We also look to legislative history in this instance because the declared

policy of the MFA is to ensure that state legislatures are able to regulate the business of insurance without unintended federal interference.[8]

The legislative history of the credit scoring bill and the arguments of its opponents indicates that the Texas Legislature was aware of the possibility of a disparate impact on racial minorities, yet did not expressly provide for a disparate impact claim as it did in the Texas Labor Code. Despite its longstanding prohibition of unfair discrimination, the Legislature first expressly authorized the use of credit scoring in setting insurance rates in 2003. Act of June 2, 2003, 78th Leg., R. S., ch. 206, § 3.01, 2003 Tex. Gen. Laws 916, 916–21, *repealed by* Act of May 24, 2005, 79th Leg., R. S., ch. 728, § 11.020(b), 2005 Tex. Gen. Laws 2188, 2217 (recodifying the relevant credit scoring sections of the Insurance Code into TEX. INS.CODE chapter 559) (originally codified at TEX. INS.CODE ANN. art. 21.49–2U, § 7(a) (West Supp.2003)). Opponents of the credit scoring bill admonished:

> The state should ban the practice of credit scoring. Tornadoes do not strike homeowners on the basis of their credit scores, and no independent studies have proven any statistical relationship between a consumer's credit history and his or her ability to drive or maintain an automobile.... Credit scoring is discriminatory, especially against women, minorities, low-income consum-

---

8. *See* 15 U.S.C. § 1011 ("Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."); *W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal.,* 451 U.S. 648, 654, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981) (stating that Congress passed the MFA "believing that the business of insurance is 'a local matter, to be subject to and regulated by the laws of the several States'" (citing H.R.Rep. No. 143, at 2 (1945))); *In re Title Ins. Antitrust Cases,* 702 F.Supp.2d 840, 871 (N.D.Ohio 2010) ("Indeed, it would seem that this type of activity [setting insurance rates] is precisely the kind that the McCarran–Ferguson Act meant to leave to the state legislatures to regulate.").

ers, and consumers who conduct all of their personal business on a cash basis.

House Research Org., Bill Analysis, Tex. S.B. 14, 78th Leg., R.S., 20 (May 21, 2003). Despite those concerns, the Legislature decided to authorize credit scoring in pricing insurance, but addressed some of the concerns with certain statutory restrictions. In addition to prohibiting the use of "factors that constitute unfair discrimination," TEX. INS.CODE ANN. art. 21.49–2U, § 7(a) (West Supp.2003) (current version at TEX. INS.CODE § 559.051), the Legislature prohibited insurers from denying, cancelling, or refusing to renew a policy "solely on the basis of credit information," as well as from denying coverage solely because the consumer does not have a credit card account. *Id.* § 3(a) (current version at TEX. INS.CODE § 559.052). Also, certain information could not be used as a negative factor in an insurer's scoring methodology, such as a collection account with a medical industry code. *Id.* § 4(a)(3) (current version at TEX. INS.CODE § 559.101). However, even with these restrictions, the Legislature included no language expressly providing for a cause of action based on disparate impact.

The Legislature also directed the Commissioner of the Texas Department of Insurance (TDI) to conduct a study and submit a report to state officials and the 79th Legislature before January 1, 2005, containing, among other things:

- a summary statement regarding the use of credit information, credit reports, and credit scores by insurers ...;

- *any disproportionate impact on any class of individuals, including classes based on income, race, or ethnicity* ...; and

- recommendations from the department to the [L]egislature regarding the use of credit information by insurers.

Act of June 2, 2003, 78th Leg., R.S., ch. 201, § 3.01, sec. 15(a), (b)(1), (b)(5)-(6), 2003 Tex. Gen. Laws 916, 920–21 (expired Mar. 1, 2005) (emphasis added) (previously located at TEX. INS.CODE ANN. art. 21.49–2U, § 15 (West Supp.2003)). Insurance Commissioner Jose Montemayor completed this credit scoring study and submitted his findings in December 2004, stating in part:

> Similar to other published studies,[9] there appears to be a strong relationship between credit score and insurance risk (or loss).... [With regards to auto insurance,] as credit scores improve, the frequency decreases, i.e. people have fewer accidents or claims.

TEX. DEP'T OF INS., REPORT TO THE 79TH LEGISLATURE: USE OF CREDIT INFORMATION BY INSURERS IN TEXAS 18–20 (Dec.2004), http://www.tdi.state.tx.us/reports/documents/creditrpt04.pdf. These findings were supplemented with a report to the Legislature, which explained that under a multivariate analysis:

> For both personal auto liability and homeowners, credit score was related to claim experience even after considering other commonly used rating variables.... For both personal auto liability and homeowners, the difference in claims experience by credit score was substantial. Typically, the claim experi-

---

9. In 2003, EPIC Actuaries, LLC published a study reviewing more than 2.7 million auto insurance policies and found that an insured's credit-based insurance score is directly connected to the insured's likelihood of filing a claim, and that credit scoring measures risk not previously measured by other rating fac-

tors and is among the top predictors of risk. *See* Michael J. Miller & Richard A. Smith, THE RELATIONSHIP OF CREDIT-BASED INSURANCE SCORES TO PRIVATE PASSENGER AUTOMOBILE INSURANCE LOSS PROPENSITY (June 2003), http://www.ask-epic.com/Publications/ Relationship% 20of% 20Credit% 20Scores_062003.pdf.

ence for the 10 percent of policyholders with the worst credit scores was 1.5 to 2 times greater than that of the 10 percent of policyholders with the best credit scores. The magnitude of the variation noted in the earlier report remains unchanged even after considering other commonly used rating variables.

TEX. DEP'T OF INS., SUPPLEMENTAL REPORT TO THE 79TH LEGISLATURE: USE OF CREDIT INFORMATION BY INSURERS IN TEXAS: THE MULTIVARIATE ANALYSIS 6 (Jan.2005), http://www.tdi.state.tx.us/reports/documents/credit05sup.pdf.

In a letter accompanying the report, Commissioner Montemayor explained that while disparate impacts result from the use of credit scoring, he was without authority to ban or regulate the use of credit scoring that produces disparate impacts as long as it is actuarially sound and not intentionally discriminatory.[10] Commissioner Montemayor stated that "credit scoring, if continued, is not unfairly discriminatory as defined in current law because credit scoring is not based on race, nor is it a precise indicator of one's race." Letter from Jose Montemayor to the 79th Texas Legislature (Jan. 31, 2005) (accompanying TEX. DEP'T OF INS., SUPPLEMENTAL REPORT TO THE 79TH LEGISLATURE: USE OF CREDIT INFORMATION BY INSURERS IN TEXAS: THE MULTIVARIATE ANALYSIS (Jan.2005), http://www.tdi.state.tx.us/reports/documents/credit05sup.pdf). In addition, Commissioner Montemayor stated that the credit scoring was a coincidental variable that served as a surrogate for an unlawful factor in rating and underwriting. If this were proven to have been the case, I would have had a legal basis to make the connection between disproportionate impact and intentional discrimination, and ... ban credit scoring outright....

10. The letter specifically stated:

Disproportionate impact is a lack of symmetry, or unequal percentages. In other words, disproportionate impact is an uneven distribution of each racial group with a given risk factor, although the uneven distribution is not caused by one's race.... By the nature of risk-based pricing and underwriting, all factors used in insurance have a disproportionate impact to some extent. One could make a convincing argument to ban the use of all risk-related factors based solely on disproportionate impact. Effectively, we would ban risk-based pricing and underwriting and revert to a pricing system where we homogenize the risk and essentially charge everyone the same price—regardless of risk. That would be a set-back to all Texans, of all races, especially those of moderate to lower income whose risk remains low.

As Commissioner, I have the authority to end a practice that is either unfairly or intentionally discriminatory. However, I do not have a legal basis to ban a practice that has a disproportionate impact if it produces an actuarially supported result and is not unfairly or intentionally discriminatory. Prior to the study, my initial suspicions were that while there may be a correlation to risk, credit scoring's value in pricing and underwriting risk was superficial, supported by the strength of other risk variables. Hence, there would be evidence that

The study, however, did not support those initial suspicions. *Credit scoring, if continued, is not unfairly discriminatory as defined in current law because credit scoring is not based on race, nor is it a precise indicator of one's race....*

....

Allowing credit scoring to be used ... will ensure its link to risk under some of the strongest consumer protections in the nation, especially for people that suffer hardship. However, if the presence of credit scoring in insurance will only feed suspicion and divide us as Texans, its continued use to any degree may simply not be worth it. If the Legislature determines that credit scoring should be eliminated, then I recommend that it be phased out over time.

Letter from Jose Montemayor to the 79th Texas Legislature (Jan. 31, 2005) (accompanying TEX. DEP'T OF INS., SUPPLEMENTAL REPORT TO THE 79TH LEGISLATURE: USE OF CREDIT INFORMATION BY INSURERS IN TEXAS: THE MULTIVARIATE ANALYSIS (Jan.2005), http://www.tdi.state.tx.us/reports/documents/credit05sup.pdf) (emphasis added).

use of credit scoring in pricing insurance inevitably carried the risk of disproportionate impacts just as any risk-based assessment would, and that to discontinue insurers' assessment of risk factors would effectively homogenize the risk and essentially charge everyone the same insurance rate, something that would "be a set-back to all Texans, of all races, especially those of moderate to lower income whose risk remains low." *Id.*

■ "Even when a statute is not ambiguous on its face, we can consider other factors to determine the Legislature's intent, including ... administrative construction of the statute...." *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 493 (Tex.2001) (citing Tex. Gov't Code § 311.023). We cite the Commissioner Montemayor's letter and report here, however, more for evidence of the Texas Legislature's awareness of potential disparate impacts, and to show that the Legislature, knowing this, still chose not to expressly provide for disparate impact protection as it did in the Labor Code. The Texas Legislature expressly directed the Commissioner to analyze the effects of credit scoring in insurance pricing and report back during the next legislative session. It was during this subsequent session that the Legislature re-codified various portions of the Insurance Code, including the sections on credit scoring now codified at Texas Insurance Code chapter 559, and made no relevant changes to the Code, despite the Commissioner's warnings of the potential for disparate impacts. In fact, two bills banning credit scoring (H.B. 23 and S.B. 167), which were introduced by members of the 79th Legislature before the submission of Commissioner Montemayor's January 2005 report, died in committee after the report was submitted. *See* Tex. H.B. 23, 79th Leg., R.S. (2005); Tex. S.B. 167, 79th Leg., R.S. (2005).

Given the Legislature's and the Insurance Commissioner's awareness of the potential for disparate impacts, and the Legislature's decision to not enact any express prohibition of disparate impact discrimination in the Insurance Code, we can only conclude that the Legislature did not intend to create a cause of action for disparate impact discrimination in insurance pricing based on credit scoring.

## IV. The Texas Fair Housing Act (TFHA) Does Not Change Our Conclusion Regarding the Lack of Disparate Impact Liability in the Texas Insurance Code

■ The certified question also asks us to consider other provisions of Texas law that may provide for disparate impact protection. Ojo argues that the Texas Fair Housing Act (TFHA) should provide such protection because the FHA, which the TFHA was intended to mirror, provides for disparate impact liability in the provision of housing. *See* Tex. Prop.Code § 301.002(3) ("The purposes of this chapter are to provide rights and remedies substantially equivalent to those granted under federal law."). Federal courts have interpreted the FHA to apply to the provision of homeowner's insurance. *See, e.g., Am. Family Mut. Ins. Co.,* 978 F.2d at 299. Ojo is correct that Texas courts will generally construe Texas statutes implementing federal rights consistently with federal case law. *See, e.g., Quantum Chem. Corp.,* 47 S.W.3d at 476 (holding that the Texas Commission on Human Rights Act (TCHRA) was enacted to implement the policies of Title VII, and thus federal case law interpreting Title VII guides this Court's reading of the TCHRA). However, the TFHA contains a "carve-out" provision, which provides that provisions of the TFHA "do[ ] not affect a requirement of nondiscrimination in any

other state or federal law." TEX. PROP. CODE § 301.044(b). In addition, Ojo cannot direct us to, and indeed there is, very little federal authority confirming the existence of disparate impact liability even under the FHA in the field of insurance. *See, e.g., Saunders v. Farmers Ins. Exch.,* 537 F.3d 961, 964 (8th Cir.2008) ("Applying [HUD] standards, we have recognized a disparate impact [FHA] claim against private actors in another context. But at least with respect to insurers, the question is not free from doubt. However, the Insurers have not raised the issue and therefore we assume, without deciding, that private insurers may be liable under the [FHA] on a disparate impact theory." (internal citations omitted)); *Dehoyos v. Allstate Corp.,* 345 F.3d 290, 299 n. 7 (5th Cir.2003) ("We ... decline to differentiate claims of disparate impact and claims of intentional discrimination at this preliminary stage of litigation"); *Nationwide Mut. Ins. Co. v. Cisneros,* 52 F.3d 1351, 1362 (6th Cir.1995) (stating that "HUD has never applied a disparate impact analysis to insurers"); *Fair Hous. Opportunities of Nw. Ohio v. Am. Family Mut. Ins. Co.,* 684 F.Supp.2d 964, 967–70 (N.D.Ohio 2010) (holding that plaintiffs failed to make a prima facie case of disparate impact discrimination regarding the use of a specific valuation method as an underwriting criterion). Because the relevant provisions of the Texas Insurance Code are more recent and specific regarding discriminatory liability in the field of insurance, and because we have determined that the Insurance Code does not provide for disparate impact liability, we conclude that Ojo's argument that Texas provides for disparate impact liability in the field of insurance under the TFHA lacks merit.

## V. Conclusion

The Texas Insurance Code is void of any language creating a cause of action for a racially disparate impact. The Texas Legislature has demonstrated that it is well aware of how to create a cause of action for disparate impact in other contexts, but it has chosen not to do so in the field of insurance. When dealing with issues of policy, this Court has consistently deferred to the judgment of the Legislature, and has not created causes of action where the Legislature did not clearly express a desire to do so. *See Edgewood Indep. Sch. Dist. v. Meno,* 917 S.W.2d 717, 726 (Tex. 1995) (recognizing that it is not our responsibility "to judge the wisdom of the policy choices of the Legislature, or to impose a different policy of our own choosing."). The decision to either allow or prohibit the use of credit scoring in pricing insurance that creates disparate impacts properly rests with the Legislature, and we leave to the Legislature's judgment the question of whether to expressly create a cause of action for disparate impact in the field of insurance, as it expressly created within the Texas Labor Code. *See* TEX. LABOR CODE § 21.122(a)(1) (defining the burden of proof in asserting a cause of action for discrimination based on disparate impact). Allowing a claim against Texas insurers for using completely race-neutral factors in credit scoring would frustrate the regulatory policy of Texas that the MFA is meant to protect, which is the continued regulation of the field of insurance by the states without unintentional congressional intrusion. *See* 15 U.S.C. §§ 1011 ("[T]he continued regulation and taxation by the several States of the business of insurance is in the public interest ...."), 1012(b) ("No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, ... unless such Act specifically relates to the business of insurance...."). Therefore, we answer the

certified question by holding that Texas law does not prohibit an insurer from using race-neutral factors in credit-scoring to price insurance, even if doing so creates a racially disparate impact.

Chief Justice JEFFERSON filed a concurring opinion.

Justice WILLETT filed an opinion concurring in part.

Justice HECHT did not participate in the decision.

Chief Justice JEFFERSON, concurring.

Legislative history is not always a villain. It is central to the process by which the Legislature enacts the laws that govern society. Yet a statute's pedigree is not itself law. For that reason, this Court usually applies a text-centric model when it construes a statute. We look first to the text. When the text is not clear, we explore extrinsic aids, including legislative history. *See, e.g., City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 (Tex.2008). That we have reached some methodologi-

cal agreement,[1] even if inconstant,[2] is itself impressive, particularly in light of the difficulties other courts have experienced when attempting to accomplish this same task.[3] Textualism is easy to advocate. The difficulty lies in its implementation.

We start with the text because it is the best indication of the Legislature's intent. *See Fresh Coat, Inc. v. K–2, Inc.*, 318 S.W.3d 893, 901 (Tex.2010) ("Our ultimate purpose when construing statutes is to discover the Legislature's intent. Presuming that lawmakers intended what they enacted, we begin with the statute's text, relying whenever possible on the plain meaning of the words chosen." (citations and quotations omitted)). Thus, when we can interpret a statute by reference to its language alone, we generally do so. *Id.* In this way, we mean to avoid sacrificing a clear textual command to conflicting language in an extrinsic, non-authoritative source.[4] The animating principle behind this standard is a reluctance to use legislative history to *interpret* a clear statute. Accordingly, our cases consistently tie a discomfort with extrinsic aids to the lan-

---

1. One scholar has described methodological agreements of this type as "methodological stare decisis," which is the "practice of giving precedential effect to judicial statements about methodology." *See* Abbe R. Gluck, *The States as Laboratories of Statutory Interpretation: Methodological Consensus and the New Modified Textualism*, 119 YALE L.J. 1750, 1754 (2010).

2. *See id.* at 1789 (noting that, compared to the Court of Criminal Appeals, the Texas Supreme Court is "inconsistent but often reaches the same result, albeit more diplomatically").

3. *See id.* at 1765 ("[T]he U.S. Supreme Court is simply not in the practice of picking a single interpretive methodology for statutes. Indeed, the Court does not give stare decisis effect to *any* statements of statutory interpretation methodology."); Nicholas Quinn Rozenkranz, *Federal Rules of Statutory Interpre-*

*tation*, 115 HARV. L.REV. 2085, 2144 (2002) (noting that the Supreme Court "do[es] not seem to treat methodology as part of the holding").

4. The Supreme Court most infamously did this in *Church of the Holy Trinity v. United States*, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892), when it ignored the text of a statute on the basis of a Congressional report and its beliefs about the statute's general purpose. This decision has been frequently criticized. *See, e.g.,* Antonin Scalia, *Common–Law Courts in a Civil–Law System, in* A MATTER OF INTERPRETATION 19 (Amy Gutmann, ed.1997) (deriding the Court's "utterly inexplicable" reasoning); Adrian Vermeule, *Interpretive Choice*, 75 N.Y.U.L.REV. 74, 84 (2000) ("[T]he Supreme Court blundered badly in [*Holy Trinity* ] by incautiously equating the contents of a Senate committee report with Congress's intention. In fact, the committee report proved highly misleading. . . .").

guage of construction. *See City of Rockwall,* 246 S.W.3d at 626 ("When a statute's language is clear and unambiguous, it is inappropriate to resort to rules of construction or extrinsic aids *to construe* the language." (emphasis added));[5] *see also Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 437 (Tex.2009) ("Therefore, our practice *when construing a statute* is to recognize that the words [the Legislature] chooses should be the surest guide to legislative intent. Only when those words are ambiguous do we resort to rules of construction or extrinsic aids." (alteration in original; emphasis added; quotations and citations omitted)).

Our general rule, then, is that extrinsic aids are inappropriate "to construe" an unambiguous statute. And while the Court today does cite several pieces of legislative history, none are used to construe the relevant statute, and thus the Court follows our standard practice. Indeed, the Court states that its construction is based on the statute's language: "The Texas Insurance Code is void of any language creating a cause of action for a racially disparate impact." 356 S.W.3d at 434. The Court's opinion could begin and end with those nineteen words, just as our Constitution, without the *Federalist Papers,* has a first and last word. We engage in a larger discourse, however, because it is useful to understand what options were available when our representatives in government enacted policy.[6]

An appellate opinion is not a mere recitation of legal standards and conclusions. It *is* that, to be sure, but it is also, perhaps more importantly, one part of a dialogue between parties, citizens, legislators, and judges—a dialogue that provides a historical record of the relevant controversy. Even where our decision is purely legal, it begins with an account of the case's facts—the story of how the case arose, and

---

5. We have relied on this language from *Rockwall* multiple times. *See Molinet v. Kimbrell,* 54 Tex.Sup.Ct.J. 491, 493, 356 S.W.3d 407, 414 (Tex.2011); *Tex. Lottery Comm'n v. First State Bank of DeQueen,* 325 S.W.3d 628, 637 (Tex.2010).

6. And we engage in this wider discourse regularly. In 2010 alone, we repeatedly cited legislative history absent a finding of ambiguity. For example, in *Robinson v. Crown Cork & Seal Co. Inc.,* 335 S.W.3d 126, 130–150 (Tex.2010), we delved deeply into legislative history despite finding no statutory ambiguity, looking even to floor statements and defeated amendments. Similarly, in *Klein v. Hernandez,* we cited legislative history, noting, without regard to questions of ambiguity, that it was a proper subject for consideration in statutory interpretation. *Klein v. Hernandez,* 315 S.W.3d 1, 6 (Tex.2010) ("The cardinal rule of statutory construction is to ascertain and give effect to the Legislature's intent. When determining that intent, the Code Construction Act further guides our analysis, listing a number of relevant factors including ... legislative history...." (citation omitted)). *See also Franka v. Velasquez,* 332 S.W.3d 367, 381 n.

66 (Tex.2011) (finding no statutory ambiguity, but citing and quoting at length Michael S. Hull, et al., *House Bill 4 and Proposition 12: An Analysis with Legislative History, Part Three,* 36 Tex. Tech. L.Rev. 169, 290–93 (2005)); *Tex. Comptroller of Pub. Accounts v. Atty. Gen. of Tex.,* 354 S.W.3d 336, 348 (Tex. 2010) (finding no ambiguity, but citing, for background and contextual information, Office of Consumer Credit, Legislative Report Reviewing Identity Theft and Senate Bill 473 (2004)); *Univ. of Tex. v. Herrera,* 322 S.W.3d 192, 198 n. 39 (Tex.2010) (citing legislative history to determine "whether Congress validly abrogated the State's immunity" because that inquiry is "mandated by controlling caselaw"); *City of Waco v. Kelley,* 309 S.W.3d 536, 548 (Tex.2010) (despite not finding ambiguity, noting that "[n]othing in the current language of the statute or the legislative history indicates legislative intent to change the disciplinary options that were originally available to the commission in cases of indefinite suspension"); *City of Dallas v. Abbott,* 304 S.W.3d 380, 384–85 (Tex.2010) (citing legislative history absent a finding of statutory ambiguity).

how it came to be in front of us. Many times, we could give our conclusions of law without reference to any of this, but we choose to include this "extraneous" information because it gives context to our decision, making it more approachable to our readers and more easily integrated into our social fabric. In this sense, we as judges act as storytellers and historians.[7]

We tell these stories because doing so is crucial to our legitimacy. Our judgments carry with them a threat of state authority.[8] As justification for the coercive impulse behind our decisions, we give not only a conclusion but also a narrative,[9] by which we seek to legitimize our decision by placing it in historical context, demonstrating that it is consistent with our notions of justice—and, indeed, that it comports with the state of the law.

When used in this contextual manner, there is little reason to think legislative history inappropriate for citation.[10] An exhortation that extrinsic sources *never* be cited for *any* purpose gives such sources too much power and judges too little credit. A legislative report, for example, frequently will provide useful information about the period in which the statute was enacted.[11] It can give the reader some

---

**7.** *Cf.* OLIVER WENDELL HOLMES, THE COMMON LAW 5 (2005) ("The life of the law has not been logic: it has been experience. The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow-men, have had a good deal more to do than the syllogism in determining the rules by which men should be governed."). *See also* Interview by Bryan A. Garner with Chief Justice John G. Roberts, in Washington, D.C. (Mar. 2, 2007), *available at* http://legaltimes.typepad.com/files/garner–transcripts–1.pdf ("Every lawsuit is a story. I don't care if it's about a dry contract interpretation; you've got two people who want to accomplish something, and they're coming together—that's a story.") (all Internet materials as visited May 25, 2011 and copy available in Clerk of Court's file).

**8.** Max Weber famously described the state as "the form of human community that . . . lays claim to the monopoly of the legitimate physical violence within a particular territory." Max Weber, *Politics as a Vocation, in* THE VOCATION LECTURES 33 (David Owen & Tracy B. Strong, eds., Rodney Livingstone, trans.2004). This principle also applies to the courts, the arm of the state tasked with interpreting the law. Our pronouncements are therefore law, and the law is enforced through the threat of the state's authority; thus, one scholar notes that "legal interpretation is as a practice incomplete without violence—because it depends upon the social practice of violence for its efficacy." Robert M. Cover, *Violence and*

*the Word,* 95 YALE L.J. 1601, 1613 (1986). Indeed,

> Legal interpretation takes place in a field of pain and death. . . . Legal interpretive acts signal and occasion the imposition of violence upon others: A judge articulates her understanding of a text, and as a result, somebody loses his freedom, his property, his children, even his life.

*Id.* at 1601.

**9.** *Cf.* Robert M. Cover, *The Supreme Court, 1982 Term—Foreword: Nomos and Narrative,* 97 HARV. L.REV 4, 5 (1983) ("[L]aw and narrative are inseparably related. Every prescription is insistent in its demand to be located in discourse—to be supplied with history and destiny, beginning and end, explanation and purpose. And every narrative is insistent in its demand for its prescriptive point, its moral." (footnote omitted)).

**10.** *See* Jonathan T. Molot, *The Rise and Fall of Textualism,* 106 COLUM. L. REV. 1, 38–39 (2006) ("Legislative history may or may not have any bearing on the outcome of the case, even when it is considered. . . . [I]n some circumstances even textualists themselves will look to legislative history. Of course they will not use it to try to construct the intent of a statute's authors. That is precisely the offense that textualism has been rallying against for decades. But textualists will sometimes use legislative history to gain a background understanding of the problems Congress was trying to address." (citations omitted)).

**11.** For example, in *United States v. Fausto,* 484 U.S. 439, 444–45, 108 S.Ct. 668, 98

indication of *why* an issue was before the Legislature, and this information is useful as context even where it is irrelevant to the specific act of interpretation.[12] This "why" may not be important to the result, but it is important to readers—both lay and expert—and the Legislature,[13] all of whom look to our opinions as a complete and fair recording of the case's circumstances. Nothing we do is in a vacuum, and our readers care about more than mere results—background is given not because it controls, but because it contextualizes.[14] And, of course, we as judges frequently make decisions in light of other extraneous information that could, in some circumstances, bear on our decisionmaking. If we are trusted to make fair decisions despite recitations of sympathetic or compelling facts, why should we not also be trusted to give fair interpretations despite looking to legislative history for general background? There is no justification for placing one enormous, useless hole in our consideration of a case's history. That this information can be useful in a non-interpretive manner is well-demonstrated by the fact that all but one justice, aware of and in agreement with our methodological principles, nonetheless join today's opinion. This is not inconsistency; it is a recognition that commitment to the text is not a commitment to blind ourselves to otherwise useful information solely because of its source.

So what does the Court's survey of legislative history tell us today? The Court makes no attempt to construct the stat-

L.Ed.2d 830 (1988), Justice Scalia, writing for the Court, cited a Senate Report as evidence of a statute's purpose. *See also* Yule Kim, Cong. Research Serv., 97–589, Statutory Interpretation: General Principles and Recent Trends 42 (2008) ("Reference to legislative history [in judicial opinions] for background and historical context is commonplace."); Christian E. Mammen, Using Legislative History in American Statutory Interpretation 189 (2002) ("But other kinds of information may also be found in legislative history: factual information about the historical and political context in which the statute was debated and ultimately enacted, expert analysis about the issues implicated by the statute, and even contextual linguistic usage."); Norman J. Singer & J.D. Shambie Singer, Sutherland on Statutory Construction § 48:1 (7th ed. 2007) ("Extrinsic aids consist of background information about circumstances which led to the enactment of a statute, events surrounding enactment, and developments pertinent to subsequent operation.").

12. *See* Cass R. Sunstein, *Interpreting Statutes in the Regulatory State*, 103 Harv. L.Rev. 407, 431 (1989) ("Legislative history has in fact provided a valuable sense of context in a number of recent cases.").

13. The Code Construction Act expressly gives courts permission to consider legislative history even in the absence of statutory ambigui-ty. Tex. Gov't Code § 311.023(3). Thus, a court never acts illegally when it considers legislative history, and to the extent that we believe that history usually should not be considered when construing a clear statute, that belief is the result of pragmatic considerations—a recognition that extrinsic aids will usually be a less reliable guide to legislative intent than the words the Legislature used. But a standard based on pragmatism does not benefit from pronouncements of universality.

14. *See* Mammen, *supra* note 11, at 102 ("[D]iscovering the context in which the statute was enacted seems to be an integral part of the rationale for using extrinsic materials...."); Robin Kundis Craig, *The Stevens/Scalia Principle and Why It Matters: Statutory Conversations and a Cultural Critical Critique of the Strict Plain Meaning Approach*, 79 Tul. L.Rev. 955, 979 (2005) ("[A]llowing courts to consult statutory history, legislative history, and administrative history ... allows courts to contextualize statutory language."); John F. Manning, *Textualism as a Nondelegation Doctrine*, 97 Colum. L.Rev. 673, 702 (1997) ("In their search for context, textualist judges routinely draw interpretive insights from sources outside the statutory text." (footnote omitted)).

ute's meaning by looking at its history. Instead, it gives us information that, while not essential to our interpretation of the Insurance Code, is far from irrelevant: "The legislative history of the credit scoring bill and the arguments of its opponents indicates that the Texas Legislature was aware of the possibility of a disparate impact on racial minorities, yet did not expressly provide for a disparate impact claim as it did in the Texas Labor Code." 356 S.W.3d at 430. Thus, we are told that the statute says what it says because the Legislature intended that meaning.[15] This fact has no bearing on our interpretation, and we would interpret clear language the same regardless of whether or not the Legislature had given thought to the specific issue before us. The inclusion of this history gives notice to those who feel wronged by the statute. The remedy they seek requires engagement in the political process, on the legislative battlefield. Moreover, it gives those same aggrieved citizens some indication of *why* the Legislature would have made the choice that it

did, allowing them to hone their advocacy. For those who support the statute, this language's relevance is much the same. This guidance will not harm democracy, our reputation, or the bar, and indeed it may help.

Justice WILLETT, concurring in part.

The Court is right that today's outcome is dictated by the Insurance Code as it is written. That being so, I wish the Court were more inhibited to do what we have prohibited—mine extratextual clues to illuminate an already-unambiguous statute. Text alone does not answer every question, but it answers many, including today's, as the Court concedes. I accept a cautious (and non-villainous) role for extrinsic aids, including certain legislative history, where a nebulous statute is susceptible to varying interpretations,[1] but our rule for unambiguous statutes is uncomplicated: "Where text is clear, text is determinative,"[2] making any foray into extratextual aids not just inadvisable but, as we have repeatedly derided it, "inappropriate."[3]

---

**15.** Even Justice Scalia would permit reference to legislative history when it is not used to give meaning to statutory terms. Thus, in *Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989), Justice Scalia concurred in the result but wrote separately to criticize the majority for consulting legislative history to "determin[e] what, precisely, the" text at issue meant. *Id.* at 528, 109 S.Ct. 1981 (Scalia, J., concurring). But his opposition to legislative history was not without limits, and rather focused only on the link between extrinsic sources and construction:
I think it entirely appropriate to consult all public materials, including the background of [the statute] and the legislative history of its adoption, to verify that what seems to us an unthinkable disposition ... was indeed unthought of....
*Id.* at 527, 109 S.Ct. 1981; *see also* Sunstein, 103 Harv L.Rev. at 431 n. 96 ("In Bock ... *all* the members of the Court ... agreed that the legislative history helped to reveal that literalism would lead to inadvertent absurdi-

ty.... Indeed, even Justice Scalia acknowledged the usefulness of history here...."); Manning, 97 Colum. L.Rev. at 702 (noting that elements of Justice Scalia's interpretive philosophy "require[ ] judges to resort to extrinsic sources in determining statutory meaning"). Today, the Court engages in exactly this sort of use, consulting historical sources to show that the Legislature was aware of what it was doing.

**1.** *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644, 652 & n. 4 (Tex.2006) ("[W]here enacted language is nebulous, we may cautiously consult legislative history to help divine legislative intent," but as a rule, "[i]f the text is unambiguous, we must take the Legislature at its word and not rummage around in legislative minutiae.").

**2.** *Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 437 (Tex.2009) (citations omitted).

The Court nowhere states—or even suggests—the Insurance Code is ambiguous. But even assuming *arguendo* it is, "thus justifying cautious use of secondary construction aids,"[4] the Court beckons some strange ones, including some we have consistently decried as patently unreliable (like failed bills in a subsequent Legislature). The Court's detour may be well meaning, but it is not well supported, and I regret its "disparate impact" on our interpretive precedent. I would hold to our holdings—when the Legislature speaks plainly, the judiciary should as well. In other words, and applying a rule less prudish than prudent, if it is not necessary to look further, it is necessary not to look further. An unembellished interpretation of an unambiguous statute can be spare without being sparse. For these reasons, I agree with all but Part III.C of today's opinion.

AS for CHIEF JUSTICE JEFFERSON's concurrence, I confess it vexes me. It at once espouses methodological stare decisis, that our interpretive rules merit precedential effect, yet declines to embrace it. It reaffirms our concretized rule that "extrinsic aids are inappropriate to construe an unambiguous statute," yet allows legislative history a "general background" and "noninterpretive" role.[5] Boiled down, legislative materials *cannot* be used to construe but *can* be used to contextualize. This distinction strikes me as gossamer-thin

(and is notably undrawn by the Court itself).[6] Given that context is baked into construction, I cannot easily discern at what epochal point "contextualizing" (permitted) ends and "construing" (prohibited) begins. In my view, such opaque differentiations incautiously invite semantic gamesmanship (by litigants, legislators, and judges alike), and I am concerned that one judge's context is another judge's pretext. One mystifying (and hazardous) byproduct of the proposed context/construction distinction: Judges using legislative history to "contextualize" apparently have unfettered license to rely on materials (like subsequent failed bills) that precedent roundly condemns as untrustworthy. How can something we have discarded as absolutely unreliable suddenly rate absolute reliance? And how exactly are readers, absent an express disclaimer, to divine the true interpretive basis of a court's decision? The concurrence depicts judges as "storytellers,"[7] but given that context and construction are inextricably fused, how can one know when a court is telling a story versus selling a story?

### I. The Court Rightly Holds the Statute is Unambiguous, Making it "Inappropriate" to Rummage Around in Legislative Minutiae.

The Court's textual analysis is clear, careful, and convincing. The crux is whether scoring is based on race, not bears on race.

---

3. *Molinet v. Kimbrell*, 356 S.W.3d 407, 414 (Tex.2011) (citations omitted); *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 637 (Tex.2010) (citation omitted); *City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 (Tex.2008) (citations omitted); *Ex parte Roloff*, 510 S.W.2d 913, 915 (Tex.1974) (citation omitted); *Fox v. Burgess*, 157 Tex. 292, 302 S.W.2d 405, 409 (1957).

4. *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 868 n. 5 (Tex.2009).

5. 356 S.W.3d at 438 (internal quotation marks omitted).

6. It brings to mind Chico Marx's classic quip, "I wasn't kissing her, I was just whispering in her mouth." THE OXFORD DICTIONARY OF QUOTATIONS 451 (Angela Partington ed., 4th ed.1992).

7. 356 S.W.3d at 437.

Beyond the Insurance Code's use of "based on"[8] and "because of"[9] is its conspicuous non-use of disparate-impact language. I say conspicuous because at least two other Texas antidiscrimination laws predating these Insurance Code provisions—one in the Labor Code and one in the Government Code—expressly authorize disparate-impact liability in other areas.[10] The Legislature knows well how to permit such claims, and the inclusion in those laws suggests something about its exclusion in this law: It was intentional. We should generally presume the Legislature "acts intentionally and purposely in the disparate inclusion or exclusion" of particular statutory language,[11] and it would exceed our judicial function "to eliminate clearly expressed inconsistency of policy" when an unambiguous statute collides with policies adopted in related statutes.[12] Unlike other Texas laws, the textual focus of the Insurance Code is solely

motivative, not resultive, asking if credit scoring purposely draws racial lines or merely falls along such lines. In my view that ends the inquiry, textually and *con* textually.

Instead of calling it a day, however, the Court swerves into the flotsam and jetsam of legislative history. This roundabout detour is a little jarring given our forceful pronouncements over the years that unambiguous text equals dispositive text. By and large, this is a text-centric Court. Less than eight months ago, and 9–0, we cemented our commitment to determinacy in *Texas Lottery Commission v. First State Bank of DeQueen*, holding that extrinsic sources have no place when unambiguous text yields a non-absurd result.[13] This point about ambiguity is mighty unambiguous, and mighty settled given our repeated reaffirmations in 2006,[14] 2007,[15] 2008,[16] 2009,[17] 2010,[18] and 2011.[19] As we

---

8. Tex. Ins Code § 560.002(c)(3)(C).

9. *Id.* § 544.002(a).

10. Tex. Lab.Code § 21.122(a)(1); Tex. Gov't Code § 419.103(b).

11. *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).

12. *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991).

13. 325 S.W.3d at 637 ("When a statute's language is clear and unambiguous, it is *inappropriate* to resort to rules of construction or extrinsic aids to construe the language." (emphasis added) (quoting *Hughes*, 246 S.W.3d at 626)).

14. *Sheshunoff*, 209 S.W.3d at 651–52 ("[W]hen a statute's words are unambiguous and yield a single inescapable interpretation, the judge's inquiry is at an end." (citation omitted)).

15. *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex.2007) ("If a statute is clear and unambiguous, we apply its words according to their

common meaning without resort to rules of construction or extrinsic aids." (citation omitted)).

16. *Hughes*, 246 S.W.3d at 626 ("When a statute's language is clear and unambiguous, it is inappropriate to resort to rules of construction or extrinsic aids to construe the language.").

17. *Entergy*, 282 S.W.3d at 437 ("When text is clear, text is determinative of [legislative] intent. This general rule applies unless enforcing the plain language of the statute as written would produce absurd results." (citations omitted)).

18. *DeQueen*, 325 S.W.3d at 637 ("[B]ecause the Legislature expressly and unambiguously set out the method for resolving conflicts between the UCC and other statutes, it would be improper to go outside the language of the statute and use canons of construction to resolve the question.").

19. *Molinet v. Kimbrell*, 356 S.W.3d 407, 414 (Tex.2011) ("When a statute's language is clear and unambiguous it is inappropriate to resort to the rules of construction or extrinsic

held in *DeQueen*, materials outside the statute matter little—actually, not at all—when a statute itself decides the case. I pray *DeQueen* has not been dethroned.[20]

This Court has not adopted an overarching interpretive methodology to govern all statutory-interpretation cases, but we have agreed on one elemental rule: Definitive text equals determinative text, the singular index of legislative will. In other words, ambiguity is a prerequisite for wielding the extratextual tools listed in the Code Construction Act. A mere 84 days ago, we held that "[w]hen a statute's language is nebulous and '[t]he point of disagreement lies between two plausible interpretations,' we resort to additional construction aids to divine the Legislature's intent"—and *only then* did we look to the Code Construction Act.[21] The precedential takeaway is that while we sometimes consult the Act's permissive tools, we do so only on tip-toe and only when faced with "unclear" language.[22] The springboard for diving into legislative history is ambiguity.

Our cases steadfastly decline the interpretive free-for-all that occurs when courts peek behind plain language. Instead we have opted for a simpler and less-manipulable principle: Clarity means finality, and judges should read the laws that govern our lives in a manner faithful to what those laws actually say. In other words, the Code Construction Act may provide us with a buffet of interpretive options. But smartly, we have been picky eaters. The Act's language is permissive: We *may* consider outside aids even absent ambiguity. The Court's rule, however, has been mandatory: We *shall not,* and doing so is forbidden.

Regrettably, today's departure from interpretive precedent is not limited to legislative history. The Court also considers an Insurance Commissioner report that while credit scoring, like all factors used to price insurance, might impose a disproportionate impact, it is not unfairly or intentionally discriminatory under the law. The Court claims to cite the Commissioner's 2005 report "more for evidence of the Texas Legislature's awareness of potential disparate impacts" than for the Commissioner's reassuring construction that disparate-impact claims are not cognizable under the Insurance Code.[23] Three brief responses: (1) the Court justifies relying on the report by citing the Code *Construction* Act, which invites consideration of "administrative *construction* of the statute" in order "to determine the Legislature's intent";[24] (2) the Legislature was already mindful of disparate impact when it first authorized credit scoring two years earlier, according to the Court's own reliance on a 2003 House Research Organization bill analysis and also the Legislature's 2003 request for an interim study that would examine dis-

aids to construe the language." (quotation marks omitted)).

**20.** A needed rule bites the dust.

**21.** *In re Smith,* 333 S.W.3d 582, 588 (Tex. 2011) (citations omitted). Another recent case further cemented our view that, notwithstanding the Act's open-ended language, we require an ambiguity predicate: *"If* we assume that both of [two] interpretations are reasonable...." *HCBeck, Ltd. v. Rice,* 284 S.W.3d 349, 356 (Tex.2009) (emphasis added).

**22.** *Pochucha,* 290 S.W.3d at 868 n. 5 ("While the language in today's statute is somewhat unclear, thus justifying cautious use of secondary construction aids, we recently reaffirmed that such aids 'cannot override a statute's plain words.'" (citation omitted)).

**23.** 356 S.W.3d at 433.

**24.** *See* Tex. Gov't Code § 311.023(6) (emphasis added).

parate impact in credit scoring;[25] and in any event (3) any renewed legislative "awareness" in 2005 (when two bills failed to ban credit scoring outright) is wholly irrelevant to what an earlier Legislature with different members intended in 2003 when it authorized credit scoring. It seems to me the Court discusses the report "more" because the Commissioner's no-liability construction confirms the Court's no-liability construction, rather than as a multi-page prelude to a single sentence regarding two bills unenacted by a subsequent Legislature.

Our reluctance to wield the Code Construction Act's extrinsic aids absent statutory ambiguity extends beyond legislative materials. The Act does invite judges to consider the "administrative construction of the statute" even if the statute by its terms is crystal clear. "Thanks but no thanks" has been our steadfast reply. This Court does not consider agency interpretations of unambiguous statutes. A generation ago, we articulated that "[i]f the [statute being construed is] plain and unambiguous, there is no need to resort to rules of construction, and it would be inappropriate to do so. If, on the other hand, the meaning of the provision be doubtful or ambiguous, the construction placed upon a statutory provision by the agency charged with its administration is entitled

to weight."[26] Fast forward to just a few weeks ago, when we reaffirmed that principle, repeating that before we even *consider* the reasonableness of an agency's interpretation, much less grant it *deference*, "the [statutory] language at issue must be ambiguous; an agency's opinion cannot change plain language."[27] If there is no ambiguity, "that is the end of the inquiry."[28] Today, with whiplash-inducing speed, the Court says the opposite, that even *absent* ambiguity, it will consider an agency's construction of the statute—and not merely as noninterpretive "background," but rather, as the Court declares, "to determine the Legislature's intent."[29]

My respectful plea is for the Court to bring more predictability to its bread-and-butter work of statutory interpretation. As this case teaches, it is one thing to *state* consistent rules; it is another to *stick* to them. What are lower-court judges and litigants to do when early–2011's interpretive consensus suddenly becomes mid–2011's interpretive conflict? How are everyday Texans to order their affairs with certainty if the methodological goalposts shift to-and-fro from case to case? Interpretive clarity advances both stability and transparency, essential virtues that benefit legislators who draft statutes, agencies that implement them, courts that interpret them, and citizens who live under them.

---

**25.** 356 S.W.3d at 430–31 (citing to House Research Org., Bill Analysis, Tex. S.B. 14, 78th Leg., R.S., 20 (May 21, 2003) and Act of June 2, 2003, 78th Leg., R.S., ch. 201, § 3.01, sec. 15(a), (b)(1), (b)(5)–(6), 2003 Tex. Gen. Laws 916, 920–21 (expired Mar. 1, 2005) (previously located at Tex Ins.Code Ann. art. 21.49–2U, § 15 (West Supp.2003))).

**26.** *Calvert v. Kadane*, 427 S.W.2d 605, 608 (Tex.1968) (citations omitted).

**27.** *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 625 (Tex.2011) (quoting *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747 (Tex.2006)).

**28.** *Id.* at 625 (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

**29.** 356 S.W.3d at 433. This approach seems flatly at odds with the concurrence's embrace of our general rule that "extrinsic aids are inappropriate 'to construe' an unambiguous statute." *Id.* at 436. *See also R.R. Comm'n of Tex. v. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 634 (Tex.2011) (Jefferson, C.J., concurring) ("We do not defer to agency interpretations of unambiguous statutes.").

## II. In Today's Age of "Legisprudence"—Judges Construing Statutory Texts—Interpretive Consistency is Vital.

Methodology matters. The lion's share of modern-day appellate judging is "legisprudence"—interpreting statutes. Day by day, the universe of free-form, common-law judging shrinks, meaning the bulk of this Court's time is spent deciding what the Legislature's words mean. Hence the tumultuous statutory-interpretation wars, since *what* judges decide is often shaped by *how* judges decide. I believe our legal system, which erects a framework for broader society, serves the public best when it provides clear guidance, consistently applied.

Predictability matters. Vacillation occasioned by the absence of set interpretive rules (or variance from them) breeds confusion. When we say we are taking the Legislature at its word, Texans are entitled to take us at ours. Are our oft-stated rules of statutory interpretation fixed or are they fluid? Discarding our simple-but-settled rule barring secondary aids absent ambiguity raises the question of when exactly *does* the Court deem it appropriate to do what we have repeatedly branded as "inappropriate." Upon what basis will the Court determine that extratextual tools have a legitimate role even when the controlling statute is clear on its face? Honoring set interpretive rules recognizes that society operates "in the shadow of the law." Texans embroiled in legal disputes (or trying to avoid them) doubtless appreciate interpretive determinacy, which lets everyone know where the Court stands—everyday Texans looking to conduct business, lawyers looking to advise them accurately, courts looking to decide cases consistently according to clear guidance, and lawmakers looking to draft laws with assurance of how they will be interpreted.

The Court holds, rightly, that the Insurance Code as written decides this case. That unambiguity pulls the plug on consulting legislative history, which is either impermissible (if used to affect meaning) or extraneous (if not used to affect meaning). Our precedent simply does not allow the Court to have it both ways.

## III. Even if the Insurance Code *Were* Ambiguous, the Court Relies on Some Legislative Materials We Have Rejected as Unreliable.

Even if one reads the Insurance Code as nebulous, thus inviting guarded consideration of extrinsic materials, some of what the Court considers is troubling. Legislative materials are not created equal; some are more authoritative than others. We have not adopted an overarching legislative-history hierarchy to help separate wheat from chaff and guide our wary and infrequent reliance on such materials.[30]

---

**30.** Once ambiguity opens the door to guarded use of legislative history, having a principled rank-order hierarchy strikes me as worthwhile. What materials are most authoritative? We have never tackled this issue comprehensively, but given the often contradictory content within legislative history, plus the propensity of lawyers to stress only those snippets that favor their side, it seems vital that courts set (and adhere to) standards that minimize contrivance and maximize reliability. Over the years a few judges and scholars have proposed various hierarchies, an exercise that depends at least in part upon a source's accessibility, relevance, and reliability. *See generally* WILLIAM N. ESKRIDGE, JR., PHILIP P. FRICKEY & ELIZABETH GARRETT, LEGISLATION AND STATUTORY INTERPRETATION 295–307 (2000) [hereinafter "ESKRIDGE, AN INTRODUCTION TO STATUTORY INTERPRETATION"]; ABNER J. MIKVA & ERIC LANE, AN INTRODUCTION TO STATUTORY INTERPRETATION AND THE LEGISLATIVE PROCESS 36–41 (1997); FRANK B. CROSS, THE THEORY AND PRACTICE OF STATUTORY INTERPRETATION 64–67 (2009)[hereinafter "CROSS, THE THEORY AND PRACTICE OF STATUTORY INTERPRETATION"]; Lars Noah, *Divining Regulatory Intent: The Place*

Even so, the Court errs in consulting two items that rank notoriously low on the reliability scale: (1) the fact that two bills banning credit scoring died in committee,[31] and (2) a House Research Organization bill analysis summarizing the views of unidentified opponents of the credit-scoring bill.[32]

Most troubling is the Court's "perilous"[33] reliance on two failed bills in 2005 that would have banned credit scoring in pricing certain lines of insurance.[34] The Court states that given the bills' failure, it "can only conclude" that the Legislature did not intend to allow disparate-impact liability.[35] That is not so. A review of precedent "can only conclude" that interpreting language passed in 2003 through the prism of language unpassed in 2005 enjoys scant legal support.

First, "subsequent legislative history is a 'hazardous basis for inferring the intent of an earlier' Congress."[36] The United States Supreme Court reiterated this wariness just three months ago: "Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation."[37] And such reliance is

---

*for a "Legislative History" of Agency Rules,* 51 Hastings L.J. 255, 274–77 (2000); Kenneth W. Starr, *Observations About the Use of Legislative History,* 1987 Duke L.J. 371 (1987). It is important to note that such rank-ordering proposals all focus on federal and not state legislation. And while the proposals share some points of agreement—the items they deem most probative and least probative—they diverge somewhat on the wide middle of the reliability spectrum. All observers rank congressional conference-committee reports (a joint House–Senate explanation of the final compromise bill) the highest in terms of persuasiveness. *See, e.g.,* Cross, The Theory and Practice of Statutory Interpretation 64. However, there is no comparable document in Texas legislative practice. Our Legislature's version of a conference-committee report merely indicates section-by-section which version, House or Senate, the conference committee adopted. Unlike a federal conference-committee report, there is no explanatory commentary of what the bill intends to do. Reliability falls off sharply with items like statements from committee and floor proceedings, when one begins to fret more about attempts "to manipulate the statute," *id.* at 67, and suspect that material "might have been strategically planted in the record" to give the statute a favored gloss, Eskridge, An Introduction to Statutory Interpretation 304. Finally, most everyone agrees that one hits rock bottom on the reliability scale when one consider failed bills, the views of nonlegislator opponents/proponents, and post-enactment commentary.

**31.** 356 S.W.3d at 433. The Court also cites to the Legislature's recodification of portions of the Insurance Code, including what is now Section 559.051, which, as the Court notes, "made no relevant changes to the Code." *Id.* at 433. Variations in enacted text can lend helpful interpretive context, and nobody should quarrel with examining how an enacted statute changes over time. Such variations lend helpful interpretive context as they boast the imprimatur of the Legislature as a whole. *See Entergy,* 282 S.W.3d at 443 ("We give weight to the deletion of [an enacted] phrase ... since we presume that deletions are intentional and that lawmakers enact statutes with complete knowledge of existing law.") (citation omitted). Put differently, this is the history of the legislation, not legislative history.

**32.** 356 S.W.3d at 442.

**33.** *District of Columbia v. Heller,* 554 U.S. 570, 590, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

**34.** 356 S.W.3d at 433 (citing Tex. S.B. 167, 79th Leg., R.S. (2005) and Tex. H.B. 23, 79th Leg., R.S. (2005)).

**35.** 356 S.W.3d at 433.

**36.** *Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960)).

**37.** *Bruesewitz v. Wyeth LLC,* —— U.S. ——, 131 S.Ct. 1068, 1081, 179 L.Ed.2d 1 (2011).

"particularly dangerous ... when it concerns, as it does here, a proposal that does not become law." [38]

The operative judicial inquiry is what did the Legislature *in 2003* mean by the credit-scoring language it voted into law, not what legislators *in 2005* thought their predecessors meant (or should have meant).[39] Thus, contrary to the Court's description, the two failed bills, as a factual matter, are undeniably not part of "[t]he legislative history of the credit scoring bill" from two years earlier.[40] Rather, they are akin to post-hoc evidence seeking to color our interpretation of earlier-passed legislation. Importantly, we have *never* permitted such items to enter our analysis,[41] even in what the concurrence would consider a "non-interpretive" and context-providing fashion. I would not second-guess the settled wisdom that allowing bills filed in a subsequent legislative session to affect the meaning of an earlier-passed statute "would set a dangerous precedent." [42]

Second, the bills (identically worded companion bills) in no way *proposed* dispa-rate-impact liability; rather they proposed to ban credit scoring outright. The bills never mentioned disparate impact one way or the other, much less expressly authorized such claims as do the Labor and Government Codes. Our unbroken precedent for 40–plus years (and United States Supreme Court precedent for just as long) rejects reliance on failed bills.[43] As recently as 2009, we reaffirmed that "we attach no controlling significance to the Legislature's failure to enact [legislation]." [44] A generation earlier, we recognized an age-old legislative truism, equally true today, that bills often die "for reasons wholly unrelated to the Legislature's view of what the original statute does or does not mean." [45] Legislative inaction, we thus held, "would afford a dubious distinction for drawing an inference of [l]egislative intent one way or the other." [46] Our unwavering position since then has been that divining legislative intent from dead bills requires naked "inference" involving "little more than conjecture." [47] For even longer, the United States Supreme Court has reiterated its "reluctan[ce] to draw infer-

---

**38.** *LTV Corp.*, 496 U.S. at 650, 110 S.Ct. 2668.

**39.** *See Fogarty v. United States,* 340 U.S. 8, 14, 71 S.Ct. 5, 95 L.Ed. 10 (1950) ("If there is anything in these subsequent events at odds with our finding of the meaning of § 3, it would not supplant the contemporaneous intent of the Congress which enacted the Lucas Act.").

**40.** 356 S.W.3d at 430.

**41.** *E.g., Entergy,* 282 S.W.3d at 443–44 ("Just as we decline to consider failed attempts to pass legislation, we likewise decline consideration of lawmakers' post-hoc statements as to what statute means.").

**42.** *Bruesewitz,* 131 S.Ct. at 1082.

**43.** *See, e.g., Tex. Emp't Comm'n v. Holberg,* 440 S.W.2d 38, 42 (Tex.1969); *Brecht v. Abra-hamson,* 507 U.S. 619, 632, 113 S.Ct. 1710,

123 L.Ed.2d 353 (1993); *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 306, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988); *City of Milwaukee v. Illinois,* 451 U.S. 304, 332 n. 24, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981); *Transamerica Mortg. Advisors, Inc. v. Lewis,* 444 U.S. 11, 33, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *American Trucking Ass'ns, Inc. v. Atchison, Topeka & Santa Fe Ry.,* 387 U.S. 397, 416–418, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967).

**44.** *Entergy,* 282 S.W.3d at 443 (quoting *Holberg,* 440 S.W.2d at 42) (quotation marks omitted).

**45.** *Holberg,* 440 S.W.2d at 42.

**46.** *Id.*

**47.** *See Dutcher v. Owens,* 647 S.W.2d 948, 950 (Tex.1983).

ences from Congress' failure to act."[48] Indeed, because legislative inaction is susceptible of multiple interpretations, even High Court decisions that have mined other types of legislative history have, in the same opinion, frowned upon attaching importance to failed bills, reasoning that "unsuccessful attempts at legislation are not the best of guides to legislative intent."[49] Most recently, the Court warned "[i]t is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process."[50] As a matter of law and logic, that peril seems even graver in this case, where the Court looks not to provisions deleted while the credit-scoring bill itself was being drafted, but rather two bills that failed years later. The Court offers no reason why such "evidence," rejected as untrustworthy in 2009, is suddenly trustworthy in 2011.

Of this there can be no doubt: Bills die in the Texas Legislature for reasons both innumerable and inscrutable—"there are many reasons for saying no."[51] Lending any weight to the fact that two bills "died in committee" two years later contravenes our unbroken precedent and also potentially pivots on something perhaps nonpivotal. It may be much ado about nothing, or much ado about something, but that some-

thing can never be known. It is less legislative history than legislative mystery.

Also worrisome is the Court's reliance on a House Research Organization bill analysis and its summary of the views of the credit-scoring bill's unidentified detractors. HRO is a nonpartisan and independent department of the House with a well-earned reputation for impartiality and professionalism.[52] It provides a wide range of information on policy issues facing state government, and its myriad reports are undoubtedly helpful to individual legislators and their staff. But as HRO itself acknowledges, its publications "are not an official part of the legislative process nor an official expression of the views of the Texas House of Representatives."[53] By contrast, bill analyses prepared by a legislative committee are attributable to that committee (though often authored by legislative staff or outside interests who are promoting the bill). The bill analyses prepared by HRO and by legislative committees differ in timing, authorship, audience, content, and purpose, and only committee bill analyses are considered part of the formal legislative process.

In any event, the statements of bill opponents, like failed bills, are discredited indicators of statutory meaning. "Courts

---

48. *Brecht,* 507 U.S. at 632, 113 S.Ct. 1710 (quoting *Schneidewind,* 485 U.S. at 306, 108 S.Ct. 1145).

49. *Red Lion Broad. Co. v. F.C.C.,* 395 U.S. 367, 381 n. 11, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

50. *Entergy,* 282 S.W.3d at 443 (quoting *Heller,* 554 U.S. at 590, 128 S.Ct. 2783) (quotation marks omitted).

51. REED DICKERSON, THE INTERPRETATION AND APPLICATION OF STATUTES 160 (1975). A bill may boast strong bipartisan and bicameral support yet fail on a technical parliamentary point of order. It may be squashed by a contrary committee chair. It may die a mysterious death in the House Calendars Committee. It

may fall prey to rigid timetable deadlines. It may be held hostage as leverage to affect other legislation. It may have 20 votes in the Senate but not the traditional 21. It may get caught in inter-member crossfire. All to say, a bill has many off-ramps.

52. House Research Organization, Texas House of Representatives, *About the House Research Organization,* available at http://www.hro.house.state.tx.us/about.aspx (last visited May 26, 2011) [hereinafter "House Research Organization, *About the House Research Organization* "].

53. *Id.*

almost never rely on representations about legislation by opponents, who have every incentive to misstate the bill's effect." [54] Justice Frankfurter 63 years ago recognized the "common practice" (even then) by those "with their own axes to grind" manipulating the legislative record in order to assure "desired glosses upon innocent-looking legislation." [55] That same year, Justice Jackson similarly observed that "[i]t is a poor cause that cannot find some plausible support in legislative history." [56] That out-and-out untrustworthiness explains why, in the hierarchy of legislative material, "statements by opponents are among the least authoritative, as they are meant to defeat the bill in question and do not represent the considered and collective understanding of those ... who passed the bill into law." [57] *Bryan v. United States*[58] is instructive on this point. In that case involving an ambiguous statute, the United States Supreme Court consulted selected bits of legislative history but drew a firm line at considering statements by bill opponents. The Court explained, "[t]he fears and doubts of the opposition are no authoritative guide to the construction of legislation," [59] because,

"[i]n their zeal to defeat a bill, they understandably tend to overstate its reach." [60] It is revealing that even when courts delve into the recesses of legislative history, most pay no attention to bill opponents given "the well-recognized phenomenon of deliberate manipulation of legislative history." [61] And of course the more judges rely on it, the less reliable it becomes, as "technocrats, lobbyists and attorneys have created a virtual cottage industry in fashioning legislative history so that the Congress will appear to embrace their particular view in a given statute." [62] With good reason the laws of evidence are wary of records that are prone to being corrupted in order to posture for eventual litigation—"so are legislative histories, which often have become seedbeds for interested parties to plant pre-litigation amicus briefs." [63]

These doubts regarding authoritativeness are especially well-warranted when one understands the nature and preparation of HRO bill analyses, which, as HRO itself acknowledges, "are not an official part of the legislative process." [64] When a bill clears its House committee and heads

54. ESKRIDGE, AN INTRODUCTION TO STATUTORY INTERPRETATION 304.

55. *Shapiro v. United States*, 335 U.S. 1, 48–49, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948) (Frankfurter, J., dissenting).

56. Robert H. Jackson, *Problems of Statutory Interpretation*, 8 F.R.D. 121, 125 (1948).

57. *Natural Res. Def. Council v. E.P.A.*, 526 F.3d 591, 605 (9th Cir.2008) (citation and quotation marks omitted). *See also* CROSS, THE THEORY AND PRACTICE OF STATUTORY INTERPRETATION 66 ("This legislative history is generally considered less reliable, because opponents may have an incentive to distort the bill to make it appear unreasonable, in order to gain allies for its rejection.").

58. 524 U.S. 184, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998).

59. *Id.* at 196, 118 S.Ct. 1939 (quoting *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 394, 71 S.Ct. 745, 95 L.Ed. 1035 (1951)).

60. *Id.* (quoting *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 66, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964)).

61. *F.E.C v. Rose*, 806 F.2d 1081, 1090 (D.C.Cir.1986).

62. Starr, 1987 DUKE L.J. at 377.

63. Note, *Why Learned Hand Would Never Consult Legislative History Today*, 105 HARV. L.REV. 1005, 1019 (1992).

64. House Research Organization, *About the House Research Organization*.

for the floor, HRO prepares a bill analysis that, in part, summarizes the views of supporters and opponents. But importantly, when an HRO bill analysis speaks of "opponents," it is referring principally to *non* legislative opponents, the outside lobbyists and other third-party advocacy interests—plus everyday civic-minded Texans—who have weighed in for, on, or against a bill. HRO staff may listen to audio (or watch video) of the committee hearing, but if time is short they may not. HRO will contact those who registered at the hearing and solicit their two-cents' worth. But if a committee hearing is sparsely attended, HRO will reach out to a range of other activists and interest groups it surmises might have an interest in the bill, whether or not they ever formally weighed in. HRO will also gather online and other written advocacy materials from those who want to influence the bill's fate.

Finally, the Court's statement that the opponents' views indicate "that the Texas Legislature was aware of the possibility of a disparate impact" [65] is factually untrue. HRO is a House entity that prepares information for House members, just as the Senate Research Center provides information for senators. The Court indulges a naked inference that the Legislature as a whole had studied the HRO's summary of what certain unidentified opponents, who may not have even attended the committee hearing, had to say.

Unsuccessful bills and unsuccessful bill opponents—"I can think of no better example of legislative history that is unedifying and unilluminating." [66] I side with Justice Jackson, who believed, consistent with our precedent, that resort to legislative history "is only justified where the face of the Act is inescapably ambiguous." [67] As he elegantly explained: "Laws are intended for all of our people to live by; and the people go to law offices to learn what their rights under those laws are." [68] And even if citizens could afford the "cost of repeatedly examining the whole congressional history," [69] they still "would not know any way of anticipating what would impress enough members of the Court to be controlling." [70] Thus, to allow legislative history to modify statutory meaning "is to make the law inaccessible to a large part of the country." [71] I would not inflict another layer of expense and complexity where the Legislature has already spoken plainly.

## IV. It is Perplexing Why The Court Abruptly Changes Interpretive Course in This Case.

Given our oft-professed allegiance to unambiguous language, it is difficult to understand the Court's decision to peek behind ambiguity-free text without asking a simple question: Why? What is distinctive about this case that warrants departing from our firm—and recently reaffirmed—maxim that extrinsic aids are "inappropriate" where the statute itself decides the case?

It is true that this case involves a sensitive public-policy matter, but we have not to this point altered our ordinary interpretive rules for controversial cases. Indeed, few cases since I joined the Court have stoked more rancorous debate than *Enter-*

65. 356 S.W.3d at 430.

66. *Schwegmann Bros.,* 341 U.S. at 397, 71 S.Ct. 745 (Jackson, J., concurring).

67. *Id.* at 395, 71 S.Ct. 745.

68. *Id.* at 396, 71 S.Ct. 745.

69. *Id.*

70. *Id.*

71. *Id.* at 397, 71 S.Ct. 745.

*gy Gulf States, Inc. v. Summers,*[72] our 2009 workers-compensation decision. There, Summers and several amici (including some legislators) implored the Court to embellish its analysis "by going beyond the statutory text and looking to extrinsic aides [sic] such as the Act's legislative history."[73] Given the Act's textual clarity, we declined, instead repeating our time-honored rule: "[W]e have been clear that we do not resort to such extrinsic aides [sic] unless the plain language is ambiguous."[74] As shown by *Entergy,* for all its sound and fury, sensitive cases have not desensitized us to our prior holdings. Even then, we chose methodological consistency over the view that certain controversies merit scrapping our settled rule that "[w]here text is clear, text is determinative,"[75] meaning "the judge's inquiry is at an end."[76]

So I remain flummoxed as to why the Court, which declares this case can be decided under the Insurance Code alone, instead blazes a new interpretive trail. Whatever the reason—and I hope it is not subject-matter sensitivity, as even disparate-impact cases require non-disparate treatment—differentiated standards no doubt confound litigants embroiled in other disputes who expect their cases will be reviewed according to consistent rules, consistently applied. Every case that arrives at this Court is consequential; every case deserves our most painstaking study; and every litigant must have confidence

that his legal questions are being answered under unvarying "rule of law" standards from case to case.

Jurists of goodwill have diverse views regarding legislative history—when to use it and how to use it. And while I side with the textualists, I well understand the counterarguments. My concern today is focused narrowly on cases where the Legislature's words decide the case all by themselves. And my regret is the Court's abandonment of its text-minded moorings absent any showing, or even assumption, of textual ambiguity. Because the Insurance Code is clear, particularly when juxtaposed against the Labor and Government Codes, I would not look beyond it. If this statute *were* unclear, I would consider a sensible legislative-history hierarchy that, in part, would reject sources we have repeatedly decried as unreliable.

### V. The Concurrence Rests Upon a Meringue–Like Distinction, That Context Can Be Divorced From Construction.

The concurrence labels as its "animating principle" the rejection of any interpretive role for legislative history when statutory text is clear.[77] That principle, one I welcome, stands in tension with the Code Construction Act, which invites courts to consult legislative history "[i]n *construing* a statute" and to do so "whether or not the

---

**72.** 282 S.W.3d 433 (Tex.2009).

**73.** *Id.* at 442.

**74.** *Id.* (citing *Nash,* 220 S.W.3d at 917, and *Sheshunoff,* 209 S.W.3d at 652 n. 4). The Court in *Entergy* did include a brief discussion of so-called legislative history but only after a threshold assumption of statutory ambiguity. And even then, we rejected outright any consideration of failed legislation (and of law-

makers' post-hoc statements). *Id.* at 442–44. Instead we credited only how enacted language had changed over time, which obviously is not "legislative history" but "the legislation's history." *Id.* at 443.

**75.** *Id.* at 437 (citations omitted).

**76.** *Sheshunoff,* 209 S.W.3d at 652.

**77.** 356 S.W.3d at 435.

statute is considered ambiguous on its face."[78] As I read CHIEF JUSTICE JEFFERSON's concurrence, Texas courts should steadfastly decline the Act's open-ended invitation to utilize extrinsic aids when construing unambiguous statutes. So far, so good. But then comes a potentially rule-swallowing exception: Such material can play a "non-interpretive" role, like providing context or "general background." This is a puzzling distinction, and one that handily shoehorns forbidden material into the mix.

First, in another case decided today, we reaffirm the truism that context is inseparable from construction: "Language cannot be interpreted apart from context."[79] They are indivisible, an elemental point applicable not just to legal language but to *all* language. A statute's words always

reign supreme, but statutory meaning is not always found solely in strict literal parsing; it turns wholly on context. Modern textualism is not allergic to context, and I have dissented when I thought the Court was taking literalism too literally and adopting a wooden construction foreclosed by statutory context: "The import of language, plain or not, must be drawn from the surrounding context," a self-evident rule rooted in common sense, Texas statutory law, and caselaw from both this Court and the United States Supreme Court.[80] Indeed, even the same word can mean diametrically opposite things depending on the context.[81] As Justice Scalia, textualism's staunchest and most prominent proponent, puts it, "In textual interpretation, context is everything."[82] That being true, a judge reading a statute must always consider "the surrounding

**78.** TEX. GOV'T CODE § 311.023(3) (emphasis added).

**79.** *TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 441 (Tex.2011).

**80.** *Hughes,* 246 S.W.3d at 632–33 & nn. 6–9 (Willett, J., dissenting) (citations omitted).

**81.** *Id.* at 632 n. 6 (noting that the word "cleave" can mean either "to adhere" or "to divide").

**82.** ANTONIN SCALIA, *Common–Law Courts in a Civil Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws,* in A MATTER OF INTERPRETATION 3, 37 (Amy Gutmann ed., 1997) [hereinafter "SCALIA, A MATTER OF INTERPRETATION"]. The concurrence notes two occasions when Justice Scalia himself cited to legislative history. True enough, but both times reflect settled, if wary, use of legislative history by textualist judges who ordinarily eschew such material. Justice Scalia looked at legislative history (1) where literalism would inflict absurdity, *Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 528, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring), and (2) to resolve an ambiguity arising from a complex

regime of interrelated statutes enacted over time—but importantly, he did so only after independently verifying a committee report's accuracy and persuasiveness through other, non-legislative history sources, *United States v. Fausto,* 484 U.S. 439, 444–45, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988). The concurrence also tries to draw support from Professor Manning's observation that textualist judges, including Justice Scalia, sometimes consult extrinsic sources in their search for context. John F. Manning, *Textualism as a Nondelegation Doctrine,* 97 COLUM. L.REV. 673, 702 (1997). Yes, but the article must be read, like all things, in context. The article was speaking here of using "non-legislative history" sources to assign meaning to codified terms of art. Nobody disputes that "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings its soil with it." Felix Frankfurter, *Some Reflections on the Reading of Statutes,* 47 COLUM. L.REV. 527, 537 (1947). But Professor Manning was referring to extrinsic sources beyond legislative history, like Justice Scalia's use of legal and general-usage dictionaries, treatises, and long-repealed statutes to construe a term embedded with technical meaning, *see Moskal v. United States,* 498 U.S. 103, 121, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (Scalia, J., dissenting).

statutory landscape"[83] and be mindful of context—but more specifically, *interpretive* context.

Granted, jurists of divergent philosophical stripes might disagree on the best *elements* of context and where they lead, but modern textualists agree that language cannot be isolated from its surrounding context. Indeed, even the word "context" must be read in context. It means one thing when detailing a case's background facts and how it came before us, but something else when ascertaining textual meaning and explaining to readers how we reasoned our way to a conclusion. When construing even a facially clear statute that seems intuitively obvious, we may well look to related legislation plus other extra-statutory contextual cues to glean the text's accepted semantic import (grammatical conventions, treatises, dictionaries, specialized legal or technical usage, colloquial nuances, judicial interpretations from other jurisdictions, and so forth).[84] In other words, we tackle it much like the Court does today, minus the jolting digression into legislative history. That is, we seek *interpretive* context, a reading rooted in textual and structural evidence. So when we are construing statutes like the credit-scoring bill, we give precedence to semantic context (how a skilled user of words would read the statute); we do not consider or second-guess policy context (how well those words achieve the statute's apparent policy goals).[85] This approach, our prece-

dent teaches, is more faithful to the Legislature's policymaking supremacy and more respectful of the complex and grueling hurdles that bills (and the compromises embedded within them) must scale to become law. In this case, as the Court ably explains, semantic context points to a clear, and therefore determinative, meaning. I would stop there.

Second, the Court nowhere adopts the context/construction distinction posited by the concurrence. CHIEF JUSTICE JEFFERSON assures readers that the Court "makes no attempt to construct the statute's meaning by looking at its history," and none of the cited tidbits are being used "to construe" the Insurance Code, "thus the Court follows our standard practice."[86] The Court itself, though, steers clear of the construction/context demarcation. Indeed, its foray into legislative history and other extrinsic material makes sense only as a method of construction, as an attempt to lend interpretive weight. The Court is aiming to give authoritative content to the meaning of Section 559.051, and it seems to concede as much. Most telling, it cites as authority for peeking at legislative history the tellingly titled Code *Construction* Act which speaks of "*construing* a statute ..."[87] not "contextualizing a statute." (The concurrence parts company with the Court on this point, declaring that the Act's extrinsic aids, including legislative history, have no interpretive role when a

83. *Presidio Ind. Sch. Dist. v. Scott*, 309 S.W.3d 927, 929–30 (Tex.2010) ("Before parsing the language of § 21.307(a), a brief survey of the surrounding statutory landscape provides a helpful context for that section's use of the term 'party'....").

84. *See, e.g., Molinet v. Kimbrell*, 356 S.W.3d 407, 413 (Tex.2011) (looking to other semantic cues but declining to excavate legislative history when divining relevant statutory context); *DeQueen*, 325 S.W.3d at 635–37 (same);

*Taylor v. Firemen's & Policemen's Civil Serv. Comm'n of Lubbock*, 616 S.W.2d 187, 189–90 (Tex.1981) (same).

85. *See* John F. Manning, *What Divides Textualists From Purposivists?*, 106 COLUM. L.REV. 70 (2006).

86. 356 S.W.3d at 436.

87. TEX. GOV'T CODE § 311.023 (emphasis added).

statute is unambiguous.) Also revealing, the Court, in "determining whether the statute gives rise to a disparate impact theory of liability" [88]—in other words, *interpreting* the statute—cites three disparate-impact decisions from the United States Supreme Court that consulted legislative history, explicitly for *interpretive* purposes. In those cases, the High Court, like this Court, was trying to fortify its *interpretive* analysis, using legislative materials to divine a statute's meaning.[89] Such use is apparent in the final paragraph of Part II of today's opinion: "Given the [legislative materials]," the Court holds, "we can only conclude that the Legislature did not intend to create a cause of action for disparate impact discrimination." [90] That phrasing sounds remarkably like a Court that is construing a statute, not contextualizing one.

Third, the context/construction locution invites peculiar consequences. Under the concurrence's view, because the Court is merely using legislative history for background purposes, it is 100 percent free to rely on materials we have rejected as innately unreliable. The concurrence says we should not "blind ourselves to otherwise useful information." [91] That is precisely the point. We must be blind to material that cannot help us see. We have derided failed bills as the polar opposite of "useful"—useless to be precise. Similarly, the concurrence asks why we trust judges to make fair decisions after reciting compelling facts but not after looking at legislative history.[92] The dilemma in this case is not untrustworthy judges but, as our cases explain, untrustworthy evidence such as failed bills and off-the-record comments from unidentified detractors bent on derailing legislation.

Even if the Court *were* using legislative materials merely to set the legal stage and nothing more, why would that permit reliance on a subset of material that we have spent decades condemning as untrustworthy? Sound construction demands a sound foundation. Surely a "dubious" [93] and "perilous" [94] foundation amounting to "lit-

---

**88.** 356 S.W.3d at 430 (citing *Smith v. City of Jackson*, 544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005); *Gen'l Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)).

**89.** The Court principally cites *Smith*, 544 U.S. at 238, 125 S.Ct. 1536, to show that "courts have looked to a statute's legislative history when determining whether the statute gives rise to a disparate impact theory of liability." 356 S.W.3d at 430. Some courts may have done so, but not this one. In its certified question to us, the Ninth Circuit asks whether *Texas* law prohibits a credit-score factor from working a racially disparate impact, and I would answer the question applying ordinary Texas rules of statutory interpretation. In any event, as the Court today acknowledges, the legislative-history piece of *Smith* garnered only plurality, and not majority, support. Pre-*Smith* High Court cases consulted legislative history to determine the existence of disparate-impact liability under various antidis-

crimination laws, but that approach lacked majority support in the Court's most recent disparate-impact decision.

　The Court also attempts to justify its peek at legislative history "because the declared policy of the McCarran–Ferguson Act is to ensure that state legislatures are able to regulate the business of insurance without unintended federal interference." 356 S.W.3d at 430. I fail to see the relevance of this. If anything, the desire for minimal federal intrusion would seem to welcome application, not frustration, of our ordinary interpretive regime.

**90.** 356 S.W.3d at 433.

**91.** 356 S.W.3d at 438.

**92.** 356 S.W.3d at 438.

**93.** *Holberg*, 440 S.W.2d at 42.

**94.** *Entergy*, 282 S.W.3d at 443 (quoting *Heller*, 554 U.S. at 590, 128 S.Ct. 2783).

tle more than conjecture"[95] provides a rickety basis for construction. Given that "context is everything" in textual interpretation,[96] I would expect the Court to be as insistent on reliable context as it is on reliable construction.

Fourth, the concurrence avers textualism is difficult to implement.[97] Far from it. Today's case is not a difficult one; the Court is unanimous on all but Part III.C. The Insurance Code, given its fair interpretive context, yields a ready answer. I believe it is exceedingly (and unnecessarily) more grueling to slog through inconclusive minutiae "not always distinguished for candor or accuracy"[98] and that often does more to confuse than to clarify.

When it comes to judicial opinion-writing, less is quite often more,[99] especially less evidence that cannot be trusted. Analysis based on clear text alone may be shorter, but it is no less complete. And it is more convincing, by definition, than analysis based on material we have previously decried as unauthoritative and prone to contrivance. Plus it avoids sending the disquieting message that clear text, despite our categorical assurances to the contrary, can never be determinative— "that, presumably under penalty of malpractice liability, the oracles of legislative history, far into the dimmy past, must always be consulted."[100] As Justice Jackson first lamented 60 years ago, this imposes on ordinary citizens a high price, supplanting clarity with opacity and accessibility with indeterminacy.[101]

I agree with CHIEF JUSTICE JEFFERSON that an appellate opinion "is not a mere recitation of legal standards and conclusions."[102] But I disagree with his suggestion that opinions provide factual background just to improve storytelling. The foremost reason we include relevant facts is to demonstrate we are exercising judicial power properly. Courts do not issue advisory opinions; we decide live, real-world disputes that arise from a given set of facts. We thus describe the underlying facts to show the nature of a live controversy, and in the common-law context to help future courts discern whether a legal principle fits the facts of other disputes.

\*　　\*　　\*

The Court's textual analysis is clear and incisive, and I join it unreservedly. The meaning of the Insurance Code is apparent from its language, read in context, especially as contrasted with the Labor and Government Codes, both of which explicitly allow disparate-impact liability. All in all, though, I wish the Court were more allegiant to our longstanding interpretive precedent. We should treat similar cases similarly, not disparately. Given the rise of state legisprudence, we owe interpretive clarity—and consistency—to the courts below us, the litigants before us, the citizens beside us, and the cases beyond us.

95. *Dutcher,* 647 S.W.2d at 950.

96. SCALIA, A MATTER OF INTERPRETATION 37.

97. 356 S.W.3d at 435.

98. *Schwegmann Bros.,* 341 U.S. at 396, 71 S.Ct. 745 (Jackson, J., concurring).

99. So says the author of a dissent longer than the majority. "Physician, heal thyself." *Luke* 4:23.

100. *Conroy v. Aniskoff,* 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring in the judgment).

101. *Schwegmann Bros.,* 341 U.S. at 397, 71 S.Ct. 745 (Jackson, J., concurring).

102. 356 S.W.3d at 436.