# Supreme Court of Texas

No. 24-0759

American Pearl Group, L.L.C., a Texas Limited Liability
Company; John Sarkissian; Andrei Wirth,

*Petitioners*,

v.

National Payment Systems, L.L.C.,

*Respondent*

On Certified Question from the
United States Court of Appeals for the Fifth Circuit

**Argued January 13, 2025**

JUSTICE SULLIVAN delivered the opinion of the Court.

When money is borrowed, it comes at a price. Texas usury law sets a strict limit on just how high that price can go. *See, e.g.*, TEX. FIN. CODE § 306.004(a); *cf.* TEX. CONST. art. XVI, § 11. But how should courts go about calculating that limit under Section 306.004(a) of the Texas Finance Code? Recognizing that our interpretation of this state statute could determine the outcome of a usury case now pending in the federal

courts, the U.S. Court of Appeals for the Fifth Circuit has certified the following question to our Court:

> Section 306.004(a) of the Texas Finance Code provides: "To determine whether a commercial loan is usurious, the interest rate is computed by amortizing or spreading, using the actuarial method during the stated term of the loan, all interest at any time contracted for, charged, or received in connection with the loan." If the loan in question provides for periodic principal payments during the loan term, does computing the maximum allowable interest rate "by amortizing or spreading, using the actuarial method" require the court to base its interest calculations on the declining principal balance for each payment period, rather than the total principal amount of the loan proceeds?

*Am. Pearl Grp., L.L.C. v. Nat'l Payment Sys., L.L.C.*, 2024 WL 4132409, at *8 (5th Cir. Sept. 10, 2024) (per curiam).

Our answer is *Yes*, because the Legislature's choice of words matters. By deliberately changing the text of Section 306.004(a) from an "equal parts" approach to the "actuarial method"—a term with a well-established meaning in financial and legal contexts—the Legislature called upon courts to calculate the maximum permissible interest based on the declining principal balance for each payment period.

# I

Texas usury law prohibits lenders from charging excessive interest on loans. " 'Interest' means compensation for the use, forbearance, or detention of money." TEX. FIN. CODE § 301.002(a)(4). A loan is "usurious" when the interest exceeds the maximum amount allowed by law. *Id.* § 301.002(a)(17). A usurious transaction has three components: "(1) a loan of money; (2) an absolute obligation that the

2

principal be repaid; and (3) the exaction of a greater compensation than allowed by law for the use of . . . money by the borrower." *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex. 1982). Usury statutes are penal in nature and are therefore strictly construed. *First Bank v. Tony's Tortilla Factory, Inc.*, 877 S.W.2d 285, 287 (Tex. 1994).

For purposes of this dispute, the maximum lawful interest rate is 28% per year. TEX. FIN. CODE § 303.009(c). But a loan is not usurious just because the interest rate exceeds 28% in any particular year. *See Tanner Dev. Co. v. Ferguson*, 561 S.W.2d 777, 787 (Tex. 1977). Instead, we test for usury by "spreading" the interest over the contract's entire term. *See id.* at 786; *Pentico v. Mad-Wayler, Inc.*, 964 S.W.2d 708, 714 (Tex. App.—Corpus Christi–Edinburg 1998, pet. denied) (defining "spreading" as "a method of allocating the total interest provided for in a loan agreement over the full term of the loan").

That brings us to Section 306.004 of the Texas Finance Code, which dictates how "spreading" is to be done when calculating the interest rate of a commercial loan:

> (a) To determine whether a commercial loan is usurious, the interest rate is computed by amortizing or spreading, using the actuarial method during the stated term of the loan, all interest at any time contracted for, charged, or received in connection with the loan.
>
> (b) If a commercial loan is paid in full before the end of the stated term of the loan and the amount of interest received for the period that the loan exists exceeds the amount that produces the maximum rate authorized by law for that period, the lender shall:
>
>> (1) refund the amount of the excess to the borrower; or

>   >   (2)   credit the amount of the excess against amounts owing under the loan.
>
>   (c)   A lender who complies with Subsection (b) is not subject to any of the penalties provided by law for contracting for, charging, or receiving interest in excess of the maximum rate authorized.

TEX. FIN. CODE § 306.004. As we explain below, the parties disagree on what "using the actuarial method" requires under Section 306.004(a).

American Pearl Group, L.L.C., John Sarkissian, and Andrei Wirth (collectively, "Pearl") and National Payment Systems, L.L.C. ("NPS") operate in the credit-card-payment-processing industry. NPS serves as an intermediary between merchants and payment service providers (*i.e.*, payment processors and banks), submitting merchant processing applications and receiving a percentage of the transaction fees, referred to as residual payments. Pearl sells NPS's services in exchange for a share of the residual payments received by NPS. Pearl has similar arrangements with other intermediaries and thus has a stream of residual payments in its portfolio.

In May 2019, NPS loaned $375,100.85 to Pearl, to be repaid with interest over forty-two months. The Loan Agreement obliged Pearl to pay back $684,966.76, per a schedule allocating each month's payment between principal and interest. The schedule demanded increasing total monthly payments with constant principal portions and escalating interest portions. The Loan Agreement also incorporated a simultaneously executed Option Agreement, under which NPS could pay Pearl a five-figure sum in exchange for a six-figure slice of Pearl's residuals portfolio, allegedly worth some multiple of the scheduled interest charges.

4

In March 2022, Pearl sued NPS in the U.S. District Court for the Northern District of Texas, seeking a declaration that the NPS Loan and Option Agreement violated Texas usury law. NPS moved to dismiss. The district court granted the motion, concluding that: (1) under the "spreading doctrine," the scheduled interest payments were not usurious; (2) the purchase option's value was too uncertain to constitute interest; and (3) Pearl had not adequately alleged a scheme to conceal usury. 2024 WL 4132409, at *3.

The district court calculated the NPS Loan's interest by spreading the interest over the term of the loan in equal parts. This type of spreading stems from our decision in *Nevels v. Harris*, 102 S.W.2d 1046, 1049 (Tex. 1937), which was supposedly codified in Act of Mar. 12, 1975, 64th Leg., R.S., ch. 26, § 1, 1975 Tex. Gen. Laws 47, 47 (repealed 1997), and which we reaffirmed in *Tanner*, 561 S.W.2d at 787–88. Under the "equal parts" method, interest is calculated by multiplying the total principal by the statutory maximum interest rate and then by the term of the loan in years. Applying that method here, the district court multiplied $375,100.85 (the principal on the NPS Loan) by 28% (the maximum legal interest rate under TEX. FIN. CODE § 303.009(c)), and by 3.5 years (the term of the NPS Loan), to calculate a maximum allowable interest amount of $367,598.83. Because that figure was higher than the $309,865.91 in interest payments actually specified in the Loan Agreement's schedule, the district court found no usury violation. 2024 WL 4132409, at *4–5.

Pearl appealed to the Fifth Circuit, arguing that the district court erred by applying the "equal parts" method. Pearl contends that

5

Section 306.004(a) of the Texas Finance Code requires courts to apply the actuarial method and make calculations based on declining principal balances for each payment period, not based on the initial total principal amount. Using Pearl's proposed methodology, the total permissible interest would be $207,277.80, rendering usurious the $309,865.91 in interest charged by NPS. Pearl also maintains that the Option Agreement constitutes additional disguised interest of $783,394, based on the difference between the alleged $832,320 value of Pearl's portfolio and the $48,926 in combined payments from NPS.

Without elaborating on a lurking choice-of-law issue in the case, which the parties had argued below but didn't bother briefing on appeal, the Fifth Circuit proclaimed that "Texas law governs Pearl's usury claims." *Id.* at *1. With respect to the Option Agreement, the Fifth Circuit remanded for a "closer evaluation" of Pearl's usury claim following discovery on the value of NPS's purchase option. *Id.* at *10.

As for the Loan Agreement, the Fifth Circuit expressed uncertainty over whether the district court accurately interpreted the Texas Finance Code in calculating the interest rate NPS had charged. *Id.* at *3–8. The Fifth Circuit found it noteworthy that, in the decades since we decided *Tanner*, the Legislature had changed the statutory text to go from spreading interest "in equal parts during the period of the full stated term of the loan," Act of Mar. 12, 1975, 64th Leg., R.S., ch. 26, § 1, 1975 Tex. Gen. Laws 47, 47 (repealed 1997), to making that computation "by amortizing or spreading, using the actuarial method during the stated term of the loan," TEX. FIN. CODE § 306.004(a).

6

Our Court has "jurisdiction to answer questions of state law certified from a federal appellate court." TEX. CONST. art. V, § 3-c. Rather than hazard an *Erie* guess, therefore, the Fifth Circuit certified the question that is now before us. 2024 WL 4132409, at *8. On September 20, 2024, this Court accepted the certified question, called for merits briefing, and set the case for oral argument.

**II**

As with every question of statutory construction, "[t]he text is the alpha and omega of the interpretive process." *BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 86 (Tex. 2017). We look to the specific words chosen by the Legislature and give them their plain meaning, as informed by the context in which the enacted text appears. *See, e.g.*, *GEO Grp., Inc. v. Hegar*, 709 S.W.3d 585, 591 (Tex. 2025); *In re Facebook, Inc.*, 625 S.W.3d 80, 87–88 (Tex. 2021). When the statute is unambiguous, we apply it as written and without rendering any of it meaningless. *See, e.g.*, *Whole Woman's Health v. Jackson*, 642 S.W.3d 569, 581 (Tex. 2022); *Pruski v. Garcia*, 594 S.W.3d 322, 325 (Tex. 2020).

The phrase "actuarial method" is not defined in Section 306.004 or elsewhere in the Texas Finance Code. In such circumstances, "we typically look first to dictionary definitions" to "determine a term's common, ordinary meaning." *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018). Black's Law Dictionary defines "actuarial method" as "[a] means of determining the amount of interest on a loan by using the loan's annual percentage rate to separately calculate the finance charge for each payment period, after crediting

7

each payment, which is credited first to interest and then to principal." *Actuarial Method*, BLACK'S LAW DICTIONARY (7th ed. 1999).

To determine a term's ordinary meaning, we may also "consider the term's usage in other statutes, court decisions, and similar authorities." *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017). By rule, the Texas Department of Banking defines "actuarial method" as "the method of allocating payments made on a debt between the amount financed and the finance charge pursuant to which a payment is applied first to the accumulated finance charge and any remainder is subtracted from, or any deficiency added to, the unpaid balance of the amount financed." 7 TEX. ADMIN. CODE § 12.33(a)(1). Likewise, the federal Truth in Lending Act defines "actuarial method" as the "method of allocating payments made on a debt between the amount financed and the finance charge pursuant to which a payment is applied first to the accumulated finance charge and any remainder is subtracted from, or any deficiency is added to, the unpaid balance of the amount financed." 15 U.S.C. § 1615(d)(1). Many States define "actuarial method" in similar terms.[*]

NPS urges us to ignore this widespread definitional overlap. It argues that the interest should instead be calculated using the "equal

---

[*] *See* ARIZ. REV. STAT. § 6-601(1); COLO. REV. STAT. § 5-1-301(1); DEL. CODE tit. 5, § 969(c)(1); IOWA CODE § 537.1301(1); KAN. STAT. § 16A-1-301(1); ME. STAT. tit. 9-A, § 1-301(1); MD. CODE COM. LAW § 12-126(d)(1); MINN. STAT. § 56.001(2); N.H. REV. STAT. § 358-K:1(I); N.J. STAT. § 17:9A-59.25(f); OHIO REV. CODE § 1349.25(A); OKLA. STAT. tit. 14A, § 1-301(1); S.C. CODE § 37-1-301(1); TENN. CODE § 45-5-102(1); VT. STAT. tit. 8, § 10405(b)(4); W. VA. CODE § 46A-1-102(1); WIS. STAT. § 421.301(1); WYO. STAT. § 40-14-140(a)(i).

parts" method that we employed in *Nevels* and *Tanner*, as required by Texas's previous usury statute. *See* Act of Mar. 12, 1975, 64th Leg., R.S., ch. 26, § 1, 1975 Tex. Gen. Laws 47, 47 (repealed 1997) (requiring "amortizing, prorating, allocating, and spreading, in equal parts during the period of the full stated term of the loan" to determine whether a loan was usurious). According to NPS, this method—under which courts multiply the total loan proceeds by the maximum annual interest rate and the loan term in years—provides a simpler calculation for courts to perform and therefore creates a clear, predictable usury standard.

That may be. But NPS's policy-driven argument cannot be squared with the current statute's text and history. Though we ought not to consider legislative history in statutory interpretation, "statutory history—the statutes repealed or amended by the statute under consideration"—help "form part of the context of the statute" that is the law. *Brown v. City of Houston*, 660 S.W.3d 749, 755 (Tex. 2023) (emphasis omitted) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 256 (2012)); *see also Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421, 455 n.31 (Tex. 2011) (Willett, J., concurring) ("[N]obody should quarrel with examining how an enacted statute changes over time. . . . [T]his is the history of the legislation, not legislative history."). This statutory context "can properly be presumed to have been before all the members of the [L]egislature when they voted. So a change in the language of a prior statute presumably connotes a change in meaning." SCALIA & GARNER, *supra*, at 256.

9

The 1975 usury statute, on which NPS relies, governed loans secured by an "interest in real property" and provided:

> [D]etermination of the rate of interest for the purpose of determining whether the loan is usurious . . . shall be made by amortizing, prorating, allocating, and *spreading, in equal parts during the period of the full stated term of the loan*, all interest at any time contracted for, charged, or received, from the borrower in connection with the loan.

Act of Mar. 12, 1975, 64th Leg., R.S., ch. 26, § 1, 1975 Tex. Gen. Laws 47, 47 (repealed 1997) (emphasis added). In 1997 and 1999, however, the Texas Legislature enacted new statutes addressing the computation of interest rates for commercial loans and loans secured by real property, adopting language different from that in the 1975 statute. Rather than providing for the amortization or spreading of interest "in equal parts during the period of the full stated term of the loan," as the 1975 statute did, the 1997 and 1999 enactments required that the interest rate be "computed by amortizing or spreading, *using the actuarial method during the stated term of the loan*." TEX. FIN. CODE § 306.004(a) (emphasis added); Act of June 2, 1997, 75th Leg., R.S., ch. 1396, § 1, art. 1H.004(a), 1997 Tex. Gen. Laws 5202, 5217 (repealed 1999) (emphasis added). In other words, the Legislature expressly changed the computation method from the "equal parts" approach to the "actuarial method."

This change is telling. We're to presume "the Legislature selected language in [the] statute with care" and "with a purpose in mind." *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). True, the "equal parts" method pressed by NPS is simpler. But the desire for simplicity is not a license to override the enacted text

10

of Section 306.004(a). "The Legislature's voted-on language is what constitutes the law, and when a statute's words are unambiguous and yield but one interpretation, the judge's inquiry is at an end." *Pruski*, 594 S.W.3d at 325 (internal quotation marks omitted). The text here is clear enough: courts must use the actuarial method when calculating the interest rate of a commercial loan. And the plain, common meaning of "actuarial method" calls for interest amounts to be calculated for each payment period, based on the declining principal balance.

NPS also relies heavily on our opinions in *Nevels* and *Tanner*. Both are distinguishable. They examined distinct scenarios involving interest that was either withheld initially from loan proceeds, *see Nevels*, 102 S.W.2d at 1048–49, or advanced before the loan's repayment period for a specific year, *see Tanner*, 561 S.W.2d at 779. Neither circumstance is present here. Both cases also dealt exclusively with "interest-only" loans, where payments during the relevant periods consisted solely of interest with no periodic principal reduction occurring. As such, there was no need to account for decreasing principal balances when determining the maximum permissible interest over the loan term. It made sense, in that context, to spread the interest in equal parts over the term of the loan.

Not so here. And the numbers show why: If we were to apply the "equal parts" method and calculate the interest owed by Pearl without considering its principal payments, Pearl's final monthly payment would include $11,871.09 in interest on a principal balance of $8,930.97. The Legislature, by requiring that interest be "computed by amortizing or spreading, using the actuarial method," has decreed that Pearl's

11

declining principal balance must be factored into the calculation. *See* TEX. FIN. CODE § 306.004(a). This conclusion is supported by both the common meaning of the term "actuarial method" and the statutory history of Section 306.004.

We therefore hold that if the loan provides for periodic principal payments during the loan term, "using the actuarial method" requires courts to base their interest calculations on the declining principal balance for each payment period. Thus, the NPS Loan's total lawful interest amount is the sum of each payment period's interest amount, calculated based on the declining principal balance resulting from each of Pearl's principal payments.

### III

Words matter in statutory interpretation, and the Legislature's deliberate choice to replace "equal parts" with "actuarial method" in the Texas Finance Code cannot be dismissed as mere stylistic preference. The plain meaning of "actuarial method," consistently defined across financial and legal authorities, requires interest calculations based on declining principal balances. We therefore answer the Fifth Circuit's certified question in the affirmative: When a loan provides for periodic principal payments, Section 306.004(a)'s mandate to use the "actuarial method" requires courts to calculate maximum permissible interest based on the declining principal balance for each payment period.

_____
James P. Sullivan
Justice

**OPINION DELIVERED:** May 23, 2025

12